STATE OF CONNECTICUT *v.* MICHAEL SPENCER
(SC 17045)

Sullivan, C. J., and Borden, Katz, Vertefeuille and Zarella, Js.

---

576

Argued January 9—officially released April 27, 2004

*Howard Ehring*, senior assistant public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Mitchell Rubin*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Michael Spencer, appeals[1] from the judgment of conviction, following a jury trial, of possession of a narcotic substance in violation of General Statutes § 21a-279 (a).[2] The sole issue on appeal

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 21a-279 (a) provides: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

is whether the warrantless search of the defendant's apartment violated his constitutional right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution[3] and article first, § 7, of the Connecticut constitution.[4] We conclude that the search violated the defendant's rights under the federal constitution and, accordingly, we reverse the judgment of the trial court.[5]

The record reveals the following facts and procedural history. On April 12, 2000, the sheriff's office of Shelby County, Tennessee notified the Stamford police department that it had intercepted a Federal Express parcel containing approximately twenty-seven pounds of marijuana, and that the parcel was addressed to a "Sylvia Sloan"[6] at 16 Lipton Place in Stamford. On the basis of this information, the Stamford police surveilled the designated residence and observed that it appeared to

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[4] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[5] The defendant claims that he is entitled to greater protection from unreasonable search and seizure under the Connecticut constitution than under the federal constitution. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Because we conclude that the warrantless search of the defendant's apartment was unreasonable under the federal constitution, we need not decide whether the state constitution affords greater protection under the specific facts of the present case.

[6] At trial, various witnesses referred to the name on the parcel as "Sylvia Sloan," "Sylva Sloan," or "Sylvan Sloan."

be a multifamily house.[7] Police department records revealed that in February, 2000, officers had responded to a call at that address concerning a domestic disturbance involving the defendant and his wife.

The following morning, the police took possession of the parcel from the Stamford Federal Express office, and a field test revealed that its contents were, in fact, marijuana. They then replaced approximately five pounds of the marijuana in the box and resealed it for delivery. Later that morning, working with the statewide narcotics task force, the police conducted a "controlled delivery" of the parcel to 16 Lipton Place. Police officers surveilled the residence from vantage points approximately fifty to sixty feet away while a task force member, Detective Frederick Caruso, delivered the parcel. Caruso, dressed in a Federal Express coat and carrying the parcel and a pad of delivery invoices, rang the doorbell for the first floor apartment and knocked on the front door. The defendant opened the door. In response to Caruso's questions, the defendant verified the address and told him that his name was Michael Spencer and that he lived on the second floor. When Caruso told him that the delivery was for "Sylvia Sloan" the defendant repeated the name to himself, and then told Caruso that he would accept the package. The defendant signed the delivery invoice, took possession of the parcel and went inside and closed the front door. As Caruso walked away, the defendant came back outside, without the parcel, and looked up and down the street.

At this point, police sergeant Eugene Dohmann, and police officers Larry Eisenstein, Douglas Robinson and Wayne Scutari, approached the residence and encoun-

[7] The police officers later learned, subsequent to the arrest of the defendant, that the house contained three apartments and was owned by an elderly woman who occupied the first floor apartment. The officers also learned that the defendant and his wife occupied the second floor apartment and an elderly man lived by himself in the third floor apartment.

tered the defendant in the front doorway. They identified themselves as police officers and brought the defendant into the first floor common hallway, where they observed that the Federal Express parcel had been placed on a shelf. The officers then read the defendant his *Miranda*[8] rights and placed him under arrest. The defendant denied knowledge of the contents of the parcel or of anybody named Sylvia Sloan, and he claimed that he innocently had accepted the package.

From the bottom of a stairway of approximately twelve to fourteen steps leading up to the second floor, the officers could see that the door to the defendant's apartment was ajar. Eisenstein asked the defendant if anybody else was inside the apartment, and received no response. Eisenstein and Robinson subsequently ascended the stairs and entered the defendant's apartment. In the defendant's bedroom, they observed, in plain view on top of the defendant's bed, a homemade "crack" pipe and a dinner plate containing crack cocaine residue, as well as a rolled up $1 bill containing crack cocaine.

The defendant subsequently was charged with possession of one kilogram or more of a cannabis-type substance with intent to sell in violation of General Statutes § 21a-278 (b),[9] and possession of narcotics in

---

[8] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[9] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . possesses with the intent to sell or dispense . . . one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years, or (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

violation of § 21a-279 (a). See footnote 2 of this opinion. At trial, the defendant filed a motion to suppress the evidence of crack cocaine seized from his apartment on the ground that the evidence had been obtained illegally as the result of an unconstitutional warrantless search.[10] The trial court conducted a full evidentiary hearing on the motion to suppress, during which Dohmann, Eisenstein, Robinson and Scutari testified for the state.

Dohmann testified that the defendant was "kind of reluctant" to tell the officers whether anybody else was in his apartment. According to Dohmann, the defendant "was a bit nervous," and the officers feared that he may have been "hiding something" from them. Therefore, the officers decided to enter the apartment "to make sure no further evidence was being destroyed or possibly other people involved that may [be] escaping." They also were concerned for their safety. Dohmann explained that weapons often are involved "in that type of business . . . to prevent being detained or being arrested," and that "it's not unusual for narcotics and weapons to be found in the same building and we wanted to make sure there [were] no weapons and more importantly nobody up there to use those weapons." He further testified: "I didn't think it was just a coincidence that this package was being delivered there. So, it was our belief that there was somebody in that apartment and we didn't really expect the package to come back to the name on the package [because] it's not typically done that way for obvious reasons. So, we expected somebody was in that apartment that was expecting a large amount of marijuana and with that we're feeling there's a drug dealer in that apartment. And, if there's a drug dealer in that apartment, we don't know who

---

[10] It was undisputed that the officers' entry into the defendant's apartment constituted a warrantless search for purposes of the fourth amendment analysis.

he is and he could very well be armed." In addition, Dohmann testified that he had, in "many" situations involving arrests outside of apartments, entered those apartments without warrants to search for weapons or to prevent destruction of evidence. According to Dohmann, this practice was "standard procedure" because "[t]he safety of the officers is paramount and there's times when you just can't wait. You have to do what you have to do."

On cross-examination, Dohmann acknowledged that the investigation prior to the controlled delivery had not revealed that anybody named Sloan was living at 16 Lipton Place. He also acknowledged that his investigation had not revealed any indication that any individual living at that address might be armed or involved in the drug trade. Finally, defense counsel questioned Dohmann concerning the officers' decision to enter the defendant's apartment:

"Q. There came a time when you went up the stairs to go into [the defendant's] home—

"A. Uh-huh.

"Q. —and again, you had a suspicion that there were—you had a suspicion that there could be somebody armed upstairs?

"A. A suspicion? I wouldn't say a suspicion but we had to know.

"Q. A hunch?

"A. Our suspic—not a hunch. Just, you don't even think about it. You just have to eliminate—we have to eliminate the possibility so we went up there with the possibility of that being there and we didn't want to be surprised."

Eisenstein testified that he had observed that the defendant's door was approximately six inches ajar. He

asked the defendant "several times" whether anybody was in the apartment, and received no response. Therefore, he and Robinson performed a "protective search" of the defendant's apartment. According to Eisenstein, they did not look in any drawers, and their search was limited to places "where you might find people, human beings." Finally, he testified that he had performed protective sweeps "on numerous occasions under similar circumstances." On cross-examination, Eisenstein acknowledged that the investigation leading up to the controlled delivery of the package had not indicated that there were any armed and dangerous people living at 16 Lipton Place. He also stated that, at that time, he had not been aware of anybody in the "immediate area" of that residence who might have been "that magnitude of a marijuana dealer." In addition, Eisenstein stated: "I felt that . . . the only apartment under question here was the second floor apartment belonging to [the defendant] and that the other apartments didn't really come into play in the investigation. And, it appeared from . . . the house, there was no other noise. Nobody came out of their doors to see what was going on or anything else. So, my assumption was that he was the only one at home at that time."

Finally, Robinson testified for the state that he personally had conducted "hundreds" of protective sweeps, and "numerous" protective sweeps in situations wherein an individual had been arrested outside of an apartment. Scutari testified that the area surrounding 16 Lipton Place was known for a high level of drug activity.

In oral argument before the trial court on the defendant's motion to suppress, the state argued that the warrantless search was justified because the defendant had accepted a substantial amount of marijuana, the door to his apartment was ajar and he would not answer the officers' questions concerning whether anybody

else was in his apartment. According to the state, "the law allows for [a protective sweep] . . . where you have a quick sequence of events and the officers are concerned for their safety and they want to prevent [the destruction of] evidence . . . ."

The defendant argued, in response, that the evidence should be suppressed because it had been obtained via a warrantless search without exigent circumstances, in violation of both the federal and state constitutions. The defendant recognized *Maryland* v. *Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990), wherein the United States Supreme Court held that a protective sweep of an arrestee's home may be constitutional in some situations, but he argued that *Buie* was distinguishable because the officers in that case had been armed with an arrest warrant, and they had a reasonable and articulable suspicion that an armed accomplice may have been hiding in the arrestee's house. The defendant indicated that neither of these elements was fulfilled in the present case and, therefore, *Buie* did not apply.

The trial court, relying on *Buie*, denied the defendant's motion to suppress. In a written articulation, the court stated the factual grounds underlying its decision: "[Sergeant] Dohmann of the Stamford police [department] said that the defendant . . . was questioned and asked, who was in there and didn't answer. Police officers decided to go in for the purpose to search for weapons or people in the attic—the apartment, safety of officers paramount. . . . Officer Eisenstein said that he participated in a protective search of the property, which was a limited search, which he had done many times before. He and Officer Robinson did a protective sweep. Officer Robinson stated that he had participated in protective sweeps hundreds of times before." The trial court thereafter admitted into evidence the narcotics and drug paraphernalia seized from the defendant's

apartment. The jury returned a verdict finding the defendant not guilty of possession with intent to sell of one kilogram or more of a cannabis-type substance, and guilty of possession of narcotics. This appeal followed.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Betances*, 265 Conn. 493, 500, 828 A.2d 1248 (2003). In the present case, the trial court, citing *Buie*, determined, as a matter of law, that the warrantless search of the defendant's apartment was supported by "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Therefore, our review is plenary.

"It is a basic principle of constitutional law that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. . . . The fourth amendment's requirement that a warrant issue from a neutral and detached judicial officer rests upon the desirability of having magistrates rather than police officers determine when searches and seizures are permissible and what limitations should be placed upon such activities. . . . [H]owever, the fourth amendment proscribes only unreasonable searches and seizures, and there will be occasions when, given probable cause to search, resort to the judicial process will not be required of law enforcement officers. Thus, where exigent circum-

stances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . a warrant will not be required. . . . *State* v. *Januszewski*, 182 Conn. 142, 151–52, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); see *Chimel* v. *California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (possible harm to police officer constitutes reasonable cause for warrantless search).

"Our past cases indicate . . . that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . . and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that [a warrantless search], limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry* [v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]. [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Id., [27]. . . . If, while conducting a legitimate *Terry* search . . . the officer should, as here, discover . . . weapons, he clearly cannot be required to ignore the [weapons], and the Fourth Amendment does not require [their] suppression in such circumstances. . . . *Michigan* v. *Long*, 463 U.S. 1032, 1049–50, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 400–401, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

In *Maryland* v. *Buie*, supra, 494 U.S. 327, the United States Supreme Court addressed the "level of justification . . . required by the Fourth and Fourteenth Amendments before police officers, while effecting the arrest of a suspect in his home pursuant to an arrest warrant, may conduct a warrantless protective sweep of all or part of the premises." In *Buie*, an arrest warrant had been issued for the defendant and his suspected accomplice following an armed robbery that had been committed by two men. Id., 328. When the police went to the defendant's house to execute the warrant, the defendant was in the basement. He emerged from the basement peacefully, and the police arrested him. Id. One of the officers then entered the basement to determine whether anybody else was there and he observed certain incriminating evidence in plain view. Id.

The trial court denied the defendant's motion to suppress, and he was convicted of the crimes charged. The Maryland Court of Appeals reversed the judgment of conviction, concluding that a protective sweep must be supported by "probable cause to believe that a serious and demonstrable potentiality for danger exists." (Internal quotation marks omitted.) *Buie* v. *State*, 314 Md. 151, 159–60, 550 A.2d 79 (1988). The Court of Appeals further concluded that the state had not satisfied that probable cause requirement. Id., 165–66.

Following its grant of the state's petition for a writ of certiorari; *Maryland* v. *Buie*, 490 U.S. 1097, 109 S. Ct. 2447, 104 L. Ed. 2d 1001 (1989); the United States Supreme Court vacated the judgment, concluding that the probable cause requirement imposed by the Maryland Court of Appeals was "an unnecessarily strict Fourth Amendment standard," and remanded the case for further proceedings. *Maryland* v. *Buie*, supra, 494 U.S. 337. Drawing upon its earlier decisions in *Terry* and *Long*, which had authorized limited frisks for weapons in the interest of officer safety, the court recognized

"an analogous interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Id., 333. The court further explained: "The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. A *Terry* or *Long* frisk occurs before a police-citizen confrontation has escalated to the point of arrest. A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id.

Recognizing the often competing interests of the individual's expectation of privacy and the officers' safety, the court therefore determined that there were two levels of protective sweeps. Concerning the first tier of protective sweeps, the court concluded that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id., 334. Concerning the second tier of protective sweeps, the court concluded: "Beyond that . . . we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. The court further emphasized that a protective sweep "may extend only to a cursory inspection of those spaces where a person may be found";

id., 335; and "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id., 335–36. Guided by the principles enunciated in *Buie*, we now turn to the merits of the defendant's claim in the present case.

The defendant first contends that *Buie* is inapplicable to the present case because the rule of *Buie* was "intended" for circumstances wherein a person has been arrested inside his home, pursuant to an arrest warrant. Essentially, the defendant urges us to adopt a per se rule that protective sweeps are unreasonable when, as here, they are incident to a *warrantless* arrest conducted *outside* of the arrestee's home.

Although the United States Supreme Court never has ruled on the constitutionality of a protective sweep of a home, incident to an arrest occurring just outside that home, the federal courts that have addressed the issue uniformly have held that the reasoning of *Buie* applies to that situation. See, e.g., *United States* v. *Cavely*, 318 F.3d 987, 995 (10th Cir.), cert. denied, 539 U.S. 960, 123 S. Ct. 2653, 156 L. Ed. 2d 659 (2003); *United States* v. *Wilson*, 306 F.3d 231, 238 (5th Cir. 2002), cert. denied, 537 U.S. 1240, 123 S. Ct. 1371, 155 L. Ed. 2d 211 (2003); *Sharrar* v. *Felsing*, 128 F.3d 810, 823–24 (3d Cir. 1997); *United States* v. *Colbert*, 76 F.3d 773, 776–77 (6th Cir. 1996); *United States* v. *Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995); *United States* v. *Oguns*, 921 F.2d 442, 446–47 (2d Cir. 1990); see also *United States* v. *Kimmons*, 965 F.2d 1001, 1004, 1009–10 (11th Cir. 1992), cert. denied, 506 U.S. 1086, 113 S. Ct. 1065, 122 L. Ed. 2d 370 (1993), cert. granted and judgment vacated on other grounds, *Small* v. *United States*, 508 U.S. 902, 113 S. Ct. 2326, 124 L. Ed. 2d 239 (1993), judgment reinstated, *United States* v. *Kimmons*, 1 F.3d 1144 (11th Cir. 1993).

In *United States* v. *Henry*, supra, 48 F.3d 1284, the United States Court of Appeals for the District of Colum-

bia Circuit explained: "Although *Buie* concerned an arrest made in the home, the principles enunciated by the [United States] Supreme Court are fully applicable where, as here, the arrest takes place just outside the residence. . . . That the police arrested the defendant outside rather than inside his dwelling is relevant to the question of whether they could reasonably fear an attack by someone within it. The officers' exact location, however, does not change the nature of the appropriate inquiry: Did articulable facts exist that would lead a reasonably prudent officer to believe a sweep was required to protect the safety of those on the arrest scene?" (Citations omitted.) Furthermore, we recognize that *Buie* was grounded in the principle that arresting officers have an immediate interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Maryland* v. *Buie*, supra, 494 U.S. 333. This important safety interest is not diminished simply because the arrest has occurred just outside of the home. See *United States* v. *Colbert*, supra, 76 F.3d 776 ("in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers").

Moreover, although the arrest in *Buie* was effectuated pursuant to an arrest warrant, the United States Supreme Court did not base its decision upon this fact. Indeed, the interest of police officers in protecting their own safety, and the safety of others, is certainly no less when they arrest a suspect without an arrest warrant. We are aware of no court that has concluded that a protective sweep was unreasonable simply because the accompanying arrest had been effectuated without an arrest warrant. Indeed, some courts expressly have upheld a protective sweep as reasonable under such circumstances. See *United States* v. *Jones*, 193 F.3d

948, 949–50 (8th Cir. 1999) (police chased fleeing defendant into apartment building and arrested him without arrest warrant; protective sweep of building reasonable); *United States* v. *Kimmons*, supra, 965 F.2d 1008–1009 (protective sweep of arrestee's home reasonable after warrantless arrest just outside of home). We do not believe that *Buie* was intended to preclude the police from conducting an otherwise reasonable protective search of a home simply because an arrest has occurred just outside the home or without an arrest warrant. Therefore, we disagree with the defendant's claim that the boundaries of *Buie* are so narrowly defined and, accordingly, we decline to adopt such a limited bright-line rule.

The defendant next claims that the warrantless search of his apartment cannot be justified as either a first tier or second tier protective sweep under *Buie*. The state contends, in response, that the search constituted a permissible protective sweep under either prong of the *Buie* analysis. We agree with the defendant.

Within the first tier of protective sweeps, arresting officers can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces *immediately adjoining* the place of arrest from which an attack could be immediately launched." (Emphasis added.) *Maryland* v. *Buie*, supra, 494 U.S. 334. In the present case, the defendant was arrested in a first floor common hallway at the bottom of a stairway of approximately twelve to fourteen steps leading up to his second floor apartment. Therefore, the defendant's apartment cannot be characterized as a space "immediately adjoining" the place of the arrest. The state nevertheless contends that the search was justifiable as a first tier protective sweep because "the defendant's apartment was at the top of a short stairway, probably only eight to ten feet away and clearly analogous to the stairway leading down into the base-

ment in *Buie*." This comparison to *Buie* is of little moment, however, because the search in that case was not upheld as a valid first tier protective sweep. Rather, the United States Supreme Court remanded the case to the Maryland Court of Appeals for a determination of whether the search could be justified as a second tier protective sweep—that is, whether "the searching officer possesse[d] a reasonable belief based on specific and articulable facts that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." *Maryland* v. *Buie*, supra, 337; see also id. (Stevens, J., concurring) (on remand, "it is the State's burden to demonstrate that the officers had a reasonable basis for believing" that third party in basement might attack them or otherwise interfere with arrest).[11] We therefore must determine whether the search in the present case was justifiable as a second tier protective sweep.[12] See *Sharrar* v. *Felsing*, supra, 128 F.3d 824

[11] On remand, the Maryland Court of Appeals concluded that the protective sweep was proper under the "reasonable suspicion," or second tier, standard. *Buie* v. *State*, 320 Md. 696, 706, 580 A.2d 167 (1990), cert. denied, 498 U.S. 1106, 111 S. Ct. 1011, 112 L. Ed. 2d 1094 (1991).

[12] The state further contends that "[c]ourts will countenance first level *Buie* protective sweeps when, as here, an arrest is made outside the home, on the theory that the police officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home." Two of the four cases that the state cites on this point, however, were decided before *Buie* and, therefore, did not distinguish, analytically, between a first tier and second tier protective sweep. See *United States* v. *Hoyos*, 892 F.2d 1387, 1397 (9th Cir. 1989), cert. denied, 498 U.S. 825, 111 S. Ct. 80, 112 L. Ed. 2d 52 (1990), overruled on other grounds, *United States* v. *Ruiz*, 257 F.3d 1030 (9th Cir. 2001); *United States* v. *Sheikh*, 654 F.2d 1057, 1071 (5th Cir. 1981), cert. denied, 455 U.S. 991, 102 S. Ct. 1617, 71 L. Ed. 2d 852 (1982), overruled on other grounds, *United States* v. *Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992). The two other cases that the state cites were resolved under the second prong of *Buie*. See *United States* v. *Oguns*, supra, 921 F.2d 446–47 (upholding protective sweep under *Buie* when searching agents "could have reasonably believed" that third parties were in apartment and might jeopardize agents' safety or destroy evidence); *United States* v. *Delgado*, 903 F.2d 1495, 1502 (11th Cir. 1990) (protective sweep valid under *Buie* because police had "very good reason to believe" that more suspects were hiding in warehouse), cert. denied, 498 U.S. 1028, 111 S. Ct. 681, 112 L. Ed. 2d 673 (1991).

("a sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the *Buie* analysis").

The second tier of protective sweeps under *Buie* encompasses searches of areas beyond those spaces immediately adjoining the place of arrest. To satisfy the fourth amendment, a second tier protective sweep must be supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland* v. *Buie*, supra, 494 U.S. 334. In this case, because the defendant was in custody, the focus of our inquiry is "whether the arresting officers reasonably believed that *someone else inside the [home]* might pose a danger to them." (Emphasis in original.) *United States* v. *Colbert*, supra, 76 F.3d 777; see also *Sharrar* v. *Felsing*, supra, 128 F.3d 825 (possible presence of third party in arrestee's home is "touchstone" of protective sweep analysis). In other words, we examine whether there were "specific and articulable facts showing that another individual, who posed a danger to the officers or others," was inside the apartment at the time of the arrest. *United States* v. *Chaves*, 169 F.3d 687, 692 (11th Cir.), cert. denied, 528 U.S. 1048, 120 S. Ct. 585, 145 L. Ed. 2d 486 (1999); see also *Sharrar* v. *Felsing*, supra, 824 ("[i]f the search goes beyond the immediate adjoining areas, there must be 'articulable facts' which would warrant a reasonably prudent officer to believe that there are individuals who pose a danger in other areas of the house").[13] "Lack of information [concerning the

[13] The fact that the defendant's wife lived with him is insufficient to establish that "*someone of danger* to the [police] was in the house at that time." (Emphasis added.) *United States* v. *Akrawi*, 920 F.2d 418, 419 (6th Cir. 1990); id., 419–20 (mere presence of accomplice's mother and possible presence of defendant's girlfriend insufficient to establish reasonable belief that dangerous persons were on premises).

presence of a third party] cannot provide an articulable basis upon which to justify a protective sweep." *United States* v. *Colbert,* supra, 778.

The trial court in the present case determined that a warrantless search was justified because the defendant had not responded to the officers' questions concerning whether anybody else was in his apartment, and also because the officers had conducted "numerous" or "hundreds" of protective sweeps on prior occasions. Neither of these facts is sufficiently specific and articulable to support a reasonable belief that the defendant's apartment harbored a third party posing a danger to those on the arrest scene. The defendant's failure to respond to the officers' questions may have stemmed from a desire to invoke his *Miranda* rights. "The *Miranda* tenets 'require that a person taken into custody be advised immediately that he has the right to remain silent, [and] that anything he says may be used against him . . . . Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.' " *State* v. *Canty,* 223 Conn. 703, 710, 613 A.2d 1287 (1992), quoting *Doyle* v. *Ohio,* 426 U.S. 610, 617, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). Therefore, the defendant's silence, standing alone, is of minimal value to our inquiry. Cf. *United States* v. *Richards,* 937 F.2d 1287, 1291 (7th Cir. 1991) (arrestee had been seen in presence of murder suspect, opened door with gun *and* failed to answer officers' questions concerning other people in house; "in our opinion, the officers would have been entitled to sweep the house even if [the arrestee] said that no one else was home"). Furthermore, the fact that the officers had conducted numerous protective sweeps on prior occasions as a matter of "standard procedure" provides no basis to support a reasonable belief that a protective

sweep was necessary on *this* particular occasion. See *United States* v. *Brown*, 69 F. Sup. 2d 925, 931 (E.D. Mich. 1999) (protective sweep conducted "as a matter of course" unreasonable under *Buie*); *State* v. *Estep*, 753 N.E.2d 22, 28 (Ind. App. 2001) (warrantless search following arrest inside home unreasonable when conducted pursuant to "standard operating procedure").

At the suppression hearing, the officers testified that they had been unfamiliar with the defendant prior to their surveillance of his residence. They were unaware of whether he had any accomplices, and their investigation revealed no persons living at that address who may have been armed or involved in the drug trade.[14] Cf. *United States* v. *Wilson*, supra, 306 F.3d 239 (arrestee suspected of armed assault had unknown accomplice who also had been armed); *United States* v. *Biggs*, 70 F.3d 913, 916 (6th Cir. 1995) (officers had received information that another person would be meeting defendant at motel room and officers knew arrestee had been arrested on two previous occasions in presence of someone possessing firearm), cert. denied, 516 U.S. 1139, 116 S. Ct. 971, 133 L. Ed. 2d 891 (1996); *United States* v. *Henry*, supra, 48 F.3d 1284 (informant had advised police that arrestee's " 'boys' " or " 'counterparts' " might be with him); *United States* v. *Kimmons*, supra, 965 F.2d 1009 (arresting agents had knowledge of conspirator whose identity and whereabouts were unknown); *Buie* v. *State*, 320 Md. 696, 705, 580 A.2d 167 (1990) (arrestee had suspected accomplice who also had been armed), cert. denied, 498 U.S. 1106, 111 S. Ct. 1011, 112 L. Ed. 2d 1094 (1991).

Furthermore, the officers' testimony reveals that they had no information that any person who posed a threat

---

[14] We note, moreover, that the police did not investigate the name on the parcel, "Sylvia Sloan," beyond their determination that "[t]he name did not coincide with any of the information we found out regarding the apartment."

to the officers or to others might have been in the apartment at that time. Cf. *United States* v. *Cavely*, supra, 318 F.3d 996 (entry and visual search of house was reasonable when arrestee had told officers " 'a friend' " was inside his house, but friend did not appear or answer when officers knocked on front door, and prior search of residence had discovered firearms); *United States* v. *Biggs*, supra, 70 F.3d 916 (protective sweep of motel room reasonable when officers had received information that another person would be meeting arrestee there). Dohmann testified that he had expected that an armed drug dealer would be in the apartment because he "didn't think it was just a coincidence that this package was being delivered there." On cross-examination, Dohmann acknowledged that this expectation was not a "suspicion"—rather, the officers entered the apartment because "we have to eliminate the possibility . . . of that being there and we didn't want to be surprised."

The generalized *possibility* that an unknown, armed person may be lurking is not, however, an articulable fact sufficient to justify a protective sweep. Indeed, nearly every arrest involving a large quantity of drugs, in or just outside of a home, carries the same possibility. To allow the police to justify a warrantless search based solely upon that possibility would threaten to swallow the general rule requiring search warrants.[15] Furthermore, "allowing the police to conduct protective sweeps whenever they do not know whether anyone

---

[15] Although we acknowledge the state's concern that "firearms are ubiquitous in the drug trade and . . . drug dealers are often prone to violence," this observation, alone, is not an articulable fact sufficient to support a reasonable belief, as required by *Buie*, that the defendant's apartment harbored a person who posed a danger to the safety of the arresting officers or others on the scene. "[J]ustifying a search because drug related arrests are dangerous would permit wholesale abrogation of the Fourth Amendment reasonableness requirement . . . ." (Internal quotation marks omitted.) *United States* v. *Colbert*, supra, 76 F.3d 778 n.2.

else is inside a home creates an incentive for the police to stay ignorant as to whether or not anyone else is inside a house in order to conduct a protective sweep." *United States* v. *Colbert*, supra, 76 F.3d 778. The officers' lack of information "cannot be an articulable basis for a sweep that requires information to justify it in the first place." Id. Accordingly, we conclude that, based on the totality of all the facts and the reasonable inferences drawn therefrom, the warrantless search of the defendant's apartment was not a justifiable protective sweep under *Buie.*

We disagree with the state's contention that *United States* v. *Oguns*, supra, 921 F.2d 446–47, compels us to reach a different conclusion.[16] In *Oguns*, an informant told customs agents that a woman had instructed him to deliver a quantity of heroin from Nigeria to the defendant or to the defendant's brother in New York. Id., 444. The agents had the informant telephone the defendant, in their presence, and arrange a delivery. The two men spoke in a Nigerian dialect, which the agents did not understand. The informant then told the agents that the defendant had instructed him to bring the " 'stuff' " to his address, and that the defendant's brother might have money when he returned to the apartment on the following day. Id. The agents thereafter conducted a controlled delivery, which resulted in their arrest of the defendant just outside of his apartment. The agents noticed that the door to the defendant's apartment was open, and they conducted a warrantless search of the apartment. Id., 445. The United States Court of Appeals for the Second Circuit upheld the search as a justifiable protective sweep under *Buie.* Id., 446. Specifically, the

---

[16] Similarly, we disagree with the dissent that *Oguns* compels us to decide this case differently. The "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene"; *Maryland* v. *Buie*, supra, 494 U.S. 334; are not present in this case.

court stated: "The agents arrested [the defendant] at twilight just outside of a two family house. When the agents entered the lobby of the building, they noticed that the door to the [defendant's] apartment [abutting the hallway] was open. Even though the agents had been told that [the defendant's] brother was not in the apartment, they still could have reasonably believed that others were in the apartment. The agents also could have reasonably believed that people in the apartment saw or heard them arrest [the defendant] and might jeopardize the agents' safety or destroy relevant evidence." Id., 446–47. Although we agree with the state's contention that *Oguns* is factually similar to the present case, it is sufficiently distinguishable to preclude its application. First, the customs agents knew that the defendant was expecting the delivery of heroin. They also knew that he was working in the drug trade with at least three individuals—his brother, the informant and a woman in Nigeria. Although the informant had told the agents that the defendant's brother would not be home, the agents nonetheless reasonably could have believed that an accomplice was in the apartment at the time of the defendant's arrest. See *United States* v. *Henry*, supra, 48 F.3d 1284–85 (when police have no way of knowing whether informant was truthful concerning whether third party would be in arrestee's home, it is "unreasonable . . . to expect them to forego the necessary precautions"). In the absence of any such similar knowledge, we decline to apply the reasoning of *Oguns* to the present case.[17]

---

[17] The state also contends that, in the present case, the fact that the door to the defendant's apartment was ajar further supports a reasonable belief that a third party was in the apartment. This fact is of minimal value to our inquiry, however, in light of the fact that the defendant had just left his apartment, momentarily, to answer the front door in response to Caruso's knock. Moreover, the state's reliance on *United States* v. *Biggs*, supra, 70 F.3d 913, is misplaced. In *Biggs*, the arresting officers had other particularized information, in addition to an open door, that supported their reasonable belief that a protective sweep was necessary. Id., 916. Specifically, the officers had received information that another person would be meeting

Having concluded that the warrantless search of the defendant's apartment was unreasonable under the federal constitution, we now must determine whether the evidence seized should have been suppressed as a consequence of the illegal search. "Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. *Wong Sun* v. *United States*, [371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)]." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42, 836 A.2d 224 (2003). "Application of the exclusionary rule, however, is not automatic. [E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . . *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." (Internal quotation marks omitted.) *State* v. *Brocuglio*, 264 Conn. 778, 787, 826 A.2d 145 (2003). "[N]ot all evidence 'is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *State* v. *Luurtsema*,

the arrestee in his motel room, and they were familiar with the arrestee and knew that he previously had been arrested in the presence of someone in possession of a firearm. Id. It was within the context of these facts that the court in *Biggs* noted that the arrestee "left the motel room door open so that anyone present in the room had a clear view of the officers, thereby threatening their safety from an unknown person present in the room." Id.; see also *United States* v. *Henry*, supra, 48 F.3d 1284 (informant .l officers that arrestee might have his " 'boys' " or " 'counterparts' " v..ı.ı him, and "this information, coupled with the arrest just outside the open door, was sufficient to lead a reasonably prudent policeman to fear that he was vulnerable to attack"); *United States* v. *Oguns*, supra, 921 F.2d 446–47 (open door to defendant's apartment bordering arrest scene accompanied by other facts in case supported reasonable belief).

262 Conn. 179, 190, 811 A.2d 223 (2002), quoting *Wong Sun* v. *United States*, supra, 488. "The initial determination is, therefore, whether the challenged evidence is in some sense the product of illegal government activity. *United States* v. *Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); see also *State* v. *Miller*, 29 Conn. App. 207, 216, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993) ([b]ecause the seizure of the gun did not owe its origin in material part to the [illegal] *Terry* stop, the *Terry* stop cannot provide a basis for excluding the gun from evidence)." (Internal quotation marks omitted.) *State* v. *Hammond*, 257 Conn. 610, 627, 778 A.2d 108 (2001).

In the present case, the state does not challenge the defendant's claim that the evidence seized must be suppressed as the "fruit" of the warrantless search of his apartment, if that search had been constitutionally impermissible. Nor has the state contended that this evidence inevitably would have been discovered, in the absence of the warrantless search. See *State* v. *Cobb*, 251 Conn. 285, 337–39, 743 A.2d 1 (1999) (evidence is not excluded if obtained independently of illegal police conduct, or inevitably would have been discovered), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). Therefore, its suppression was warranted.

The judgment is reversed and the case is remanded to the trial court with direction to grant the defendant's motion to suppress.

In this opinion SULLIVAN, C. J., and VERTEFEUILLE and ZARELLA, Js., concurred.

BORDEN, J., dissenting. I disagree with the conclusion of the majority that the facts of the present case do not come within the so-called second tier protective sweep permitted under *Maryland* v. *Buie*, 494 U.S. 325,

110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).[1] I conclude, to the contrary, that those facts bring this case squarely within that doctrine and that, therefore, the seizure of the crack cocaine, which was in plain view in the bedroom of the defendant, Michael Spencer, did not violate his rights under the fourth amendment to the United States constitution.[2] Accordingly, I would affirm the trial court's judgment because, in my view, that court properly denied the defendant's motion to suppress.

As the majority aptly notes, for a protective sweep such as was undertaken in the present case to be permissible under the fourth amendment, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry*[3] and *Long*,[4] and as in those cases, we think this balance is the proper one." Id., 334.

It is important to emphasize that, in the application of *Buie*, the applicable standard under the fourth

---

[1] I agree with the majority that: (1) the facts of this case do not bring it within the so-called first tier protective sweep under *Buie*; and (2) the second tier protective sweep under *Buie* is not confined to a sweep following an arrest within the home, but also extends to a sweep inside the home following an arrest in an area close to but outside the home, as in the present case.

[2] I would also conclude that there are no persuasive reasons to conclude that our state constitution affords any more expansive protections against protective sweeps than those articulated in *Maryland* v. *Buie*, supra, 494 U.S. 325. I would, therefore, also conclude that the seizure in the present case was permissible under our state constitution.

[3] *Terry* v. *Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (fourth amendment permits patdown of person on basis of specific facts and reasonable inferences that individual is armed and dangerous).

[4] *Michigan* v. *Long*, 463 U.S. 1032, 1049–50, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) (fourth amendment permits limited search of automobile passenger compartment on basis of specific facts and reasonable inferences that individual may gain access to weapons).

amendment is objective, not subjective. That is, the question is whether, as *Buie* itself states, the articulable facts and reasonable inferences *"would warrant a reasonably prudent officer in believing* that the area to be swept harbors an individual posing a danger to those on the arrest scene." (Emphasis added.) Id. Thus, the standard does not focus on the subjective beliefs of the particular police officers, and how they might characterize them, such as a hunch, belief, suspicion, or other characterization. Furthermore, the application of an objective, rather than a subjective, standard requires that a reviewing court employ, not only the reasonable inferences that the police officers on the scene may have in fact drawn, but also those reasonable inferences that *a reasonably prudent police officer*, in the position of the police officers on the scene, *would be warranted in drawing, irrespective of whether those officers in fact drew or articulated them.* Put another way, as the Court of Appeals of Maryland concluded after the remand to it by the United States Supreme Court in *Buie* itself: "The experience and training of the particular police officers involved will form a part of the matrix of facts that define the circumstances which must be considered, but the test is whether a reasonably prudent police officer, under those circumstances, is justified in forming a reasonable suspicion that the house is harboring a person posing danger to those on the arrest scene." *Buie* v. *State*, 320 Md. 696, 703, 580 A.2d 167 (1990).

This objective standard is clear both from the language of *Buie* itself, as indicated previously, and also from its reliance on *Terry* and *Long*, both of which impose an objective, rather than a subjective, standard. See *Terry* v. *Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) ("the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in

danger"); *Michigan* v. *Long*, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) (same).

This application of the objective standard has long been uniform in fourth amendment jurisprudence. See, e.g., *Horton* v. *California*, 496 U.S. 128, 138, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by . . . a valid exception to the warrant requirement."); *Maryland* v. *Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 86 L. Ed. 2d 370 (1985) ("[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' . . . and not on the officer's actual state of mind at the time the challenged action was taken" [citation omitted]); *Scott* v. *United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978) ("the fact that the officer does not have the state of mind which is hypothe[sized] by the reasons which provide the legal justification for the officer's actions does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action"). Our own cases also recognize this fundamental principle of fourth amendment jurisprudence. See *State* v. *James*, 261 Conn. 395, 415, 802 A.2d 820 (2002) ("Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed. . . . The probable cause test then is an objective one." [Internal quotation marks omitted.]); *State* v. *Lipscomb*,

258 Conn. 68, 75, 779 A.2d 88 (2001) ("[r]easonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion" [internal quotation marks omitted]); *State* v. *Eady*, 249 Conn. 431, 441, 733 A.2d 112 ("[t]he United States Supreme Court has endorsed an objective standard, noting that 'even-handed law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer' "), cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

With this legal background in mind, I turn to the facts of the present case, which I am compelled to repeat in some detail because there are several critical facts, and the inferences rationally drawn therefrom, that the majority simply ignores in its application of the *Buie* principle. First, the package originally destined for the defendant's address contained *twenty-seven pounds* of marijuana. This permitted the reasonable inference that a large-scale illegal drug selling operation was being conducted at that address. The large amount of illegal drugs involved justifies, indeed compels, the inference that this was a shipment made for the purposes of a large-scale commercial operation. One does not ordinarily have twenty-seven pounds of marijuana shipped to oneself through Federal Express for purely personal use.

Second, the facts and circumstances, together with their rational inferences, permitted the reasonable belief that the defendant was in fact the intended recipient of the package. The defendant accepted the package despite the fact that it was not addressed either to him or to his wife. In fact, the investigation prior to the controlled delivery disclosed that no one with the name

of the addressee lived at that address; yet, the defendant accepted delivery of the package.[5] After the defendant was placed under arrest, the defendant denied knowledge of anyone named Sylvia Sloan, the addressee of the package. One ordinarily does not accept a package addressed to a person with whom one was not acquainted. Thus, it was reasonable to believe that the defendant was in fact the intended recipient, and knowingly accepted delivery, of a package addressed to a fictitious person, which the defendant believed would contain twenty-seven pounds of marijuana, and that the defendant was, therefore, part of a large-scale illegal drug selling operation located in his apartment at that address. This inference was buttressed by the defendant's furtive and suspicious conduct immediately after accepting the package, namely, reopening the door and looking up and down the street. In addition, the area around the defendant's address was known to the police as an area with a high level of drug activity. This further buttressed the reasonableness of the inference that drug selling was going on at that address.

Third, it was reasonable to believe that the defendant was not the only occupant of the apartment in which

[5] The majority's reference to the fact that the arresting officers did not investigate the name of the addressee of the parcel; see footnote 14 of the majority opinion; both ignores the testimony of police sergeant Eugene Dohmann, and is legally irrelevant. Dohmann testified that the police officers did not expect the package to be traced back to the addressee because "it's typically not done that way for obvious reasons," namely, that neither trained police officers nor even laypersons of common sense would ordinarily expect a drug seller to arrange for twenty-seven pounds of an illegal substance to be delivered to him under his given name. It is legally irrelevant because the fourth amendment focuses, not on what the facts and inferences do *not* establish, but on whether, under the objective test, those facts and circumstances *would* warrant a *reasonably prudent officer* in engaging in the protective sweep. Certainly, as indicated previously in this opinion, the fact that the defendant accepted the package, addressed *not* to him or his wife, permitted the reasonable inference that the package was being sent to the defendant under a fictitious name.

the illegal drug selling operation was being conducted. The police knew, from the domestic disturbance call just two months before, that the defendant's wife lived there, as well as the defendant. Moreover, it is certainly a rational, objective inference that one does not ordinarily conduct a large-scale illegal, commercial drug selling operation as a sole proprietor, without another participant or employee. This permitted the reasonable inference that someone in addition to the defendant, including his wife or the yet-to-be-identified Sylvia Sloan, was likely to be part of the illegal drug selling operation being conducted out of the defendant's apartment. In addition, the defendant did not respond to the police officers when they repeatedly asked him whether anyone else was in the apartment. Despite the majority's misplaced reliance on *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which I discuss later in this opinion, this reinforced the inference that, at the time of the defendant's arrest, someone else was in fact in the apartment, who was also involved in the drug operation.

Fourth, it was reasonable for the police to believe that guns or other dangerous weapons would be located in the apartment and, therefore, posed a danger to them from use by a coparticipant with the defendant in the drug operation. We have often stated, as the police officers testified in the present case, that it is reasonable for police officers to suspect guns to be associated with illegal drug selling operations. *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001) ("Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms" [internal quotation marks omitted]); see also *United States* v. *Wilson*, 306 F.3d 231, 238 (5th Cir. 2002) (dealing in narcotics sufficient for reasonable belief in potential for violence and presence of weapon).

Fifth, the door to the defendant's apartment was ajar, and was only fourteen or fifteen stairway steps away from the police officers and the defendant. This permitted the reasonable inference that the police officers were in a place where they would have a justified fear for their safety from any accomplice of the defendant in the apartment, who was likely to have been aware of the defendant's arrest.

Sixth, as the trial court, which is the sole arbiter of credibility in this case, specifically found, the police entered the apartment for the purpose of searching for weapons or other persons, the "safety of officers [being] paramount." Thus, in effect, the court found that the police had a subjective fear that someone else located in the apartment was a likely source of danger to them, and acted to alleviate that fear. This finding is conclusive on the question of the purpose of the protective sweep involved.

In sum, the police officers had reasonable and articulable suspicion: that the defendant was the intended recipient of the package containing twenty-seven pounds of marijuana, and was therefore involved in a large-scale, commercial, illegal drug selling enterprise; that someone else, who may or may not have been his wife,[6] and who also was involved in the enterprise,

---

[6] In my view, the majority's reliance on *United States* v. *Akrawi*, 920 F.2d 418 (6th Cir. 1990); see footnote 13 of the majority opinion; for the proposition that the presence of the defendant's girlfriend and his accomplice's mother is insufficient to establish a reasonable belief that dangerous persons are on the premises, is unpersuasive. First, that was not the focus of the court's opinion in *Akrawi*. In that case, the agents already had entered the residence and identified the accomplice's mother as present before the protective sweep took place. *United States* v. *Akrawi*, supra, 419. Thus, she was a known entity, and I do not read *Akrawi* as indicating that the government's reliance on a known presence as a source of a reasonable suspicion is akin to the risk posed from an unknown potential accomplice, as in the present case.

Second, the majority's focus on the defendant's wife, coupled with its lack of focus on the police officers' knowledge that the defendant resided with his wife, simply ignores the reasonable inference that the defendant

was in the apartment; that that person was likely to be armed; and that the door to the apartment, which was but fifteen steps from the site of the defendant's arrest, was ajar, and, therefore, the armed person was likely to be aware of the arrest. On the basis of these facts and inferences, the conclusion is inescapable that there were "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent police officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland* v. *Buie,* supra, 494 U.S. 334. That is what *Buie* requires, and it is all that *Buie* requires.

Indeed, the United States Court of Appeals for the Second Circuit has come to the same conclusion in a case almost identical to the present one. In *United States* v. *Oguns,* 921 F.2d 442, 444 (2d Cir. 1990), federal customs agents apprehended Saka Adenrele, who had arrived at John F. Kennedy International Airport from Nigeria carrying 1405 grams of heroin in his underwear. After Adenrele told the agents that the heroin was to be delivered to the defendant or his roommate, Timo, and Adenrele agreed to cooperate, the agents arranged a controlled delivery by Adenrele to the defendant at the defendant's apartment. Id., 444–45. In a telephone call to the defendant, the defendant told Adenrele that he did not have any money but that Timo would have the money when he returned the next day, and the

---

was not operating as a sole proprietor. Indeed, the potential existed that another person may have been participating in the defendant's large-scale drug selling operation, who may or may not have been his wife.

Finally, the fifteen to eighteen agents that entered the defendant's apartment in *Akrawi* remained there for forty-five minutes after arresting the defendant and identifying the other occupants. Id., 420–21. That fact, in the court's view, belied the agents' contention that the sweep was purely conducted for safety purposes. Id. Thus, as a factual matter, the sweep in *Akrawi* did not resemble either the sweep in *Buie* or the sweep in the present case.

defendant suggested that Adenrele come to his apartment and spend the night there. Id., 444. In a second telephone conversation one-half hour later, the defendant told Adenrele that he would be waiting for Adenrele outside his home wearing a pair of shorts. Id., 445. The agents prepared a sample of the heroin, and put it in a tote bag for Adenrele to carry. Id. Adenrele rode in a taxicab driven by an agent to the defendant's home, where the defendant was sitting on the front steps of a two-family house. Id., 444–45. The defendant approached the taxicab and paid the fare, and then he and Adenrele walked toward the building, with Adenrele carrying the tote bag that contained the sample of heroin. Id., 445. At that point, the agents arrested the defendant. Id. One of the agents, seeing an open apartment door abutting the hallway inside the building, asked the defendant if that was the door to his apartment. The defendant responded that it was. Id. The agents then conducted a security sweep of the apartment. Id.

The defendant challenged the legality of the security sweep as a predicate for his challenge to a subsequent consensual search of the apartment. Id., 446. The Court of Appeals rejected the challenge, stating: "Applying [*Buie*] to the agents' security sweep of the [defendant's] apartment, we conclude that the agents' actions did not violate [the defendant's] Fourth Amendment rights. The agents arrested [the defendant] at twilight just outside of a two family house. When the agents entered the lobby of the building, they noticed that the door to the [defendant's] apartment was open. Even though the agents had been told that [the defendant's] brother was not in the apartment, they still could have reasonably believed that others were in the apartment. The agents also could have reasonably believed that people in the apartment saw or heard them arrest [the defendant] and might jeopardize the agents' safety or destroy relevant

evidence. Had third parties been in the apartment, they would likely have been able to hear through the open door the agents arresting [the defendant] and, with that knowledge, would have posed a threat to the police outside. In view of the circumstances confronting the officers and the fact that the [D]istrict [C]ourt's factual findings were not clearly erroneous, we hold that the security sweep met the Fourth Amendment requirements specified in *Buie* . . . ." Id., 446–47.

Despite the majority's attempt to distinguish this case, I can find no distinguishing features. In both the present case and *Oguns*: (1) a large amount of illegal drugs were destined for the defendant at his address; (2) there was no certainty that anyone else was in the apartment—indeed, in *Oguns*, unlike the present case, there was specific evidence that the only other known inhabitant was *not* therein; (3) there was no specific evidence that whoever might be in the apartment would be armed; and (4) the defendants were arrested outside the apartment, and the door to the apartment was ajar, indicating that anyone inside would know of the arrest. Nonetheless, in both cases the police officers reasonably could have believed that others were in the apartment who (1) would be likely to know of their accomplice's arrest, and (2) would pose a danger to the arresting officers; and in both cases, therefore, the requirements of *Buie* were met. See also *United States v. Cavely*, 318 F.3d 987, 996 (10th Cir. 2003); *United States v. Wilson*, supra, 306 F.3d 238–39; *United States v. Howard*, 106 F.3d 70, 74–75 (5th Cir. 1997); *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995). Although opinions of the Court of Appeals for the Second Circuit are not binding on this court, we have consistently held that they are persuasive and are entitled to significant deference. See *Turner v. Frowein*, 253 Conn. 312, 340–41, 752 A.2d 955 (2000) ("In general, we look to the federal courts for guidance in resolving issues of federal

law. . . . Decisions of the Second Circuit Court of Appeals, although not binding on us, are particularly persuasive. 'In deciding to adopt the analysis of the Second Circuit Court of Appeals, we recognize that the decisions of the federal circuit in which a state court is located are entitled to great weight . . . .' " [Citations omitted.]). *Oguns* is undeniably within that category, particularly because the present case is resolved on the basis of the federal constitution.[7]

The majority opinion is fundamentally flawed. First, as I indicated previously, it fails to apply the objective test required by established fourth amendment jurisprudence and, therefore, fails to account, not only for critical undisputed facts, but for critical reasonable inferences to be drawn from those facts. In effect, it focuses, wrongly, on what was *not specifically established* by the evidence, rather than, correctly, on the reasonable inferences to be drawn from what *was undisputedly established* by the evidence. In this regard, rather than focus, collectively, on the facts and inferences established by the evidence, the majority selectively chooses particular facts, views each in isolation, and then states that each fact provided an insufficient basis on which to sweep the defendant's apartment. Such a piecemeal approach is inconsistent with accepted fourth amendment jurisprudence.

Thus, in my view, the majority oversteps this court's proper bounds in its application of the *Buie* principle.

---

[7] Indeed, if anything, the present case is an a fortiori case compared to *Oguns*. In the present case, although the majority does not, I specifically refer to the well established notion that it is perfectly reasonable for the police to believe that persons involved in drug selling are likely to be armed. The court in *Oguns* did not even mention that association in upholding the validity of the sweep under *Buie*. In addition, the police officers in the present case knew that the defendant was not the only tenant of the apartment, and he remained silent when asked if anyone else was on the premises. In *Oguns*, the agents were specifically told that the defendant's brother was not in the apartment, and the court nonetheless held that the police did not have to credit that representation. *United States* v. *Oguns*, supra, 921 F.2d 446.

It is well established that a state court cannot apply federal constitutional standards more broadly than applied by the United States Supreme Court. *Oregon* v. *Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) ("of course, a [s]tate may not impose . . . greater restrictions as a matter of federal constitutional law when this [c]ourt specifically refrains from imposing them"). The majority's application of *Buie* to the undisputed facts and reasonable inferences of the present case violates this precept. In doing so, moreover, the majority strips law-abiding police officers of the legitimate safety net that *Buie* provides, and tells them that, in a situation like this, in which an abundance of facts and inferences gives them the reasonable and articulable suspicion that their lives or those of the public are in danger, they must, if they are to obey the law, forgo their, and the public's, legitimate safety concerns.

Second, the majority's reliance on the fact that the defendant had been given *Miranda* warnings before he failed to answer the police officers' questions about whether anyone else was in the apartment is simply irrelevant to the fourth amendment analysis under *Buie*. *Miranda* is a prophylactic exclusionary rule of evidence regarding the admissibility of confessions at trial, based upon the federal constitution's fifth amendment proscription against compelled self-incrimination. See *Chavez* v. *Martinez*, 538 U.S. 760, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003). I know of no authority, nor do the cases cited by the majority establish, that *Miranda* informs the reasonableness of a security sweep under the fourth amendment.[8] Indeed, it would be bizarre

---

[8] To the extent that the concerns of *Miranda* might apply to the protective sweep in the present case, a lack of administering the warnings would likely come within the public safety exception to *Miranda*, which permits such interrogation for purposes of immediate protection of the officers and the surrounding public. See *State* v. *Betances*, 265 Conn. 493, 502–503, 828 A.2d 1248 (2003); see also *New York* v. *Quarles*, 467 U.S. 649, 657, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). This point is purely hypothetical, however, because the defendant in the present case was given *Miranda* warnings.

to hold that it does, because it would then bar law enforcement officers, who are required to give a defendant his *Miranda* warning upon arresting and questioning him, from then asking him, for their own protection and the protection of the public, whether anyone else is in his apartment. Indeed, the majority's point that silence after such warnings is "insolubly ambiguous" is also beside the point. (Internal quotation marks omitted.) A defendant's silence has been said to be "ambiguous" as it relates to a jury's ability to draw an inference therefrom at trial; see *Doyle* v. *Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); it does not play a role in determining the reasonableness of police conduct.[9] The fact that it may be ambiguous—meaning that it is susceptible of more than one plausible meaning—does not mean that the police cannot choose the more prudent meaning, and act on that choice for their own safety and the safety of others.[10] In the fourth amendment context, the objective test requires the reviewing court to give deference to the reasonable inferences drawn or drawable by the police officer involved that support the legitimacy of the search and seizure, irrespective of whether other reasonable inferences could also have been drawn that would undermine that legitimacy.

---

[9] As the majority itself recognizes with its citation to *United States* v. *Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991), even if the defendant had responded "no" to the officers' questions about whether there were other persons in his apartment, the officers may nonetheless, in their specialized judgment, reasonably elect to sweep the premises. See also *United States* v. *Oguns*, supra, 921 F.2d 446 (agents were told that defendant's roommate was not in apartment).

[10] In the present case, the defendant accepted a package originally containing twenty-seven pounds of marijuana. Upon his arrest, the defendant denied that he knew the addressee of the package, and then refused to answer the police officers' questions regarding whether anyone else was in the apartment. It is contrary to common sense to suggest, as the majority does, that the arresting officers could not consider the defendant's silence in response to their questions as one of many factors in determining whether the protective sweep was reasonable to ensure their own safety and the safety of others.

I conclude that the trial court properly denied the defendant's motion to suppress, and would affirm the judgment of the trial court. I therefore dissent.