******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

## STATE OF CONNECTICUT *v.* ROBERT A. CANE
## (AC 40657)

Alvord, Moll and Flynn, Js.

*Syllabus*

Convicted of the crimes of criminal possession of a firearm, criminal posses-
sion of ammunition and possession of a controlled substance with intent
to sell, the defendant appealed to this court, claiming, inter alia, that
the trial court improperly denied his motion to suppress certain evidence
and improperly granted the state's motion to join two separate cases
against him for trial. The defendant had been charged, in one of the cases,
with kidnapping and assault in connection with his alleged conduct with
two women, D and P, at his home. The jury found him not guilty of all
charges in that case. The police had conducted surveillance of the
defendant's home and wanted to speak to him outside of the home
because it was reported that he had a firearm when the kidnappings
and assaults were alleged to have occurred. While one officer was
speaking with the defendant on a phone, the defendant went outside
of his home several times and walked near one of his cars that was
parked in the driveway before reentering the home. The police saw the
car's lights flash and heard its engine run. The defendant told the officer
on the phone that he had the keys to the car but had not started it
remotely. After several hours of no contact with the police, the defendant
came outside of his home again and walked toward a fence that bordered
his property where he was arrested. The police then conducted a protec-
tive sweep of the home. The next day, pursuant to search warrants, the
police seized various items from the defendant's home and car that
included weapons, ammunition, marijuana and other drug related mate-
rials. *Held*:

1. The defendant could not prevail on his claim that the trial court errone-
ously denied his motion to suppress the evidence that the police seized
from his home and car:

   a. The warrantless search of the defendant's home after he was arrested
   and in police custody constituted a justifiable, protective sweep of the
   home in light of specific, articulable facts that supported a reasonable
   belief by the police that a third party who posed a danger to those on
   the arrest scene was inside the home where firearms were believed to
   be present; the police reported that they saw movement within the home
   and that there were multiple cars on the defendant's property, there
   had been a report of a serious assault of D and P that allegedly occurred
   in the home within the prior twenty-four to thirty-six hours, D and P
   had reported that the defendant had guns in the house and had people
   watch the house, and, in light of the defendant's behavior, the police
   were entitled to discredit his statements that no one was in the home
   and that he did not possess weapons or start the car in his driveway.

   b. This court found unavailing the defendant's unpreserved claims that
   he was constructively seized by the police and that they lacked probable
   cause to search his car: there was no way to know whether a violation
   of constitutional magnitude in fact had occurred, as the record was
   insufficient to determine whether the police ordered the defendant to
   exit his home when they first attempted to make contact with him or
   how many officers surrounded the home at the time that the constructive
   entry into the home allegedly occurred; moreover, the information that
   the police affiants provided in their search warrant application supported
   a determination that probable cause existed to search the defendant's
   vehicle, as the affiants' averments that they observed the defendant
   walk back and forth to the vehicle and heard it being locked or unlocked
   supported reasonable inferences that he had access to the vehicle when
   the police observed his movements or prior to their arrival, and that
   the defendant may have moved evidence from the home to the vehicle,
   and the defendant's reliance on trial testimony to support his assertion
   that the police lacked probable cause to search the car because no
   officer saw him open it or any of its hatches was unavailing, as only
   information that was before the issuing judge at the time the warrant

was signed could be considered in determining whether the warrant was based on probable cause.

2. The trial court did not commit plain error when it granted the state's motion for joinder, as the defendant, personally and through counsel, expressly stated that he had no objection to joinder; even if the defendant's waiver of his claim concerning joinder did not preclude him from prevailing under the plain error doctrine, he could not demonstrate that the claimed error was so clear and harmful that a failure to reverse the judgment would result in manifest injustice, because even though the defendant claimed that joinder prevented him from testifying concerning the firearms charges but that he had reason not to testify with respect to the assault and kidnapping counts, he did not move to sever the informations or indicate that he wanted to testify concerning some counts of the informations but not others, even when the court canvassed him regarding his decision not to testify.

3. The defendant could not prevail on his unpreserved claim of judicial bias, which was based on his assertion that the trial court, in its pretrial memorandum of decision on his motion to suppress, had found him guilty of the kidnapping and assault charges prior to any evidence when it referred to D and P as victims and then considered those charges in sentencing him, the record not having supported the defendant's contention that the court considered the kidnapping and assault charges when it sentenced him; although the court mentioned the kidnapping and assault charges when it summarized the events that led to the discovery of the firearms, ammunition and marijuana, it had referred to those charges as the "original allegations" and thereafter focused on the events that occurred on the day of the defendant's arrest, its reference to the defendant as violent was done in the context of reviewing his criminal history, not with respect to the kidnapping and assault charges, and, therefore, because the record did not provide a basis for the defendant's claim of judicial bias, there was no manifest injustice that warranted reversal of the judgment pursuant to the plain error doctrine.

Argued April 10—officially released September 24, 2019

*Procedural History*

Two substitute informations charging the defendant, in the first case, with four counts of the crime of kidnapping in the first degree, two counts each of the crimes of kidnapping in the first degree with a firearm, assault in the first degree and intimidation of a witness, and with one count of the crime of assault in the second degree, and, in the second case, with three counts of the crime of criminal possession of ammunition, two counts of the crime of criminal possession of a firearm, and with one count each of the crimes of criminal possession of a pistol or revolver, possession of a controlled substance with intent to sell, operation of a drug factory and possession of a controlled substance with intent to sell within 1500 feet of a school, brought to the Superior Court in the judicial district of New Britain, geographical area number fifteen, where the court, *Keegan, J.*, granted the state's motion for joinder; thereafter, the court denied the defendant's motion to suppress certain evidence; subsequently, the matter was tried to the jury; thereafter, the state filed a substitute information in the second case, charging the defendant with three counts of the crime of criminal possession of ammunition, two counts of the crime of criminal possession of a firearm, and one count each of the crimes of possession of a controlled substance with intent to sell and possession of a controlled substance with intent to sell within 1500 feet of a school; verdict of guilty of three counts of criminal possession of

ammunition, two counts of criminal possession of a firearm, and one count each of possession of a controlled substance with intent to sell and possession of a controlled substance with intent to sell within 1500 feet of a school; subsequently, the court granted the defendant's motion for a judgment of acquittal as to the charge of possession of a controlled substance with intent to sell within 1500 feet of a school and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Daniel M. Erwin*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Helen J. McLellan*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Robert A. Cane, appeals from the judgment of conviction, rendered following a jury trial, of two counts of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), three counts of criminal possession of ammunition in violation of General Statutes § 53a-217 (a) (1), and one count of possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (b).[1] On appeal, the defendant claims that the trial court (1) erroneously denied his motion to suppress evidence that was obtained in violation of his right to be free from unreasonable searches and seizures, (2) improperly granted the state's motion for joinder of the two separate cases against him for trial, and (3) demonstrated judicial bias, thereby violating his right to due process. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 7, 2013, the New Britain Police Department received a complaint that the defendant had kidnapped and assaulted two women, D and P, at his home, located at 830 Slater Road in New Britain, during the weekend of October 5 and 6, 2013. D's son reported that D was in the intensive care unit at the Hospital of Central Connecticut in New Britain as a result of her injuries.

At approximately 3:30 p.m. on October 7, 2013, as the police began to investigate these allegations, Michael Steele and Kyle Lamontagne, two plainclothes detectives with the New Britain Police Department, went to the defendant's home. They conducted surveillance from an unmarked police vehicle parked across the street from the defendant's home in order to determine whether the defendant was at his home and to secure the premises. At approximately 4 p.m., Karl Mordasiewicz, also a detective with the New Britain Police Department, relieved Detective Steele from his position in the unmarked vehicle. Detectives Lamontagne and Mordasiewicz eventually left the vehicle and began to surveil the defendant's home from the rear porch of a neighboring property.[2]

Additional police officers arrived shortly thereafter. The police wanted to speak to the defendant about the kidnapping and assault allegations and, because the defendant was reported to have had a firearm when the kidnappings and assaults were alleged to have occurred, they wanted to speak to the defendant outside of his home. Arthur Powers, Jr., a sergeant with the New Britain Police Department, who had known the defendant since the 1970s, called the defendant's cell phone number to try to encourage him to speak voluntarily with the officers.[3]

While Sergeant Powers was on the phone with the defendant, Detectives Lamontagne and Mordasiewicz

watched the defendant exit his home several times,[4] walk in the area near his Cadillac, and reenter his home. At one point, Detectives Lamontagne and Mordasiewicz observed the lights on the Cadillac flash and heard the engine run for approximately fifteen seconds. Sergeant Powers asked the defendant if he had started the Cadillac, and the defendant responded that, although he had the keys, he had not started the car remotely. The defendant eventually walked toward the fence that bordered his property, at which time he was arrested.[5] After arresting the defendant, the police conducted a protective sweep of the defendant's home.

The next day, on October 8, 2013, the police applied for a search and seizure warrant pertaining to the defendant's residence. The search warrant was issued at noon and executed at approximately 12:55 p.m. On the first floor of the defendant's home, the police found a rifle, which was located in a closet, and glassine bags, which were found in the kitchen. In a bedroom on the second floor of the defendant's home, the police found three boxes of Blazer Brass brand ammunition, a gun holster, a gun cleaning kit, a "loader" that assists with loading ammunition into a magazine for a firearm, and a plastic bag containing ten shotgun shells. In addition, the police found a metal box containing various types of ammunition in the closet of that bedroom. In a different bedroom also on the second floor of the defendant's home, the police found a small amount of marijuana, various lighting and power sources, and a scale. In the attic, the police found a large bag, which weighed approximately ten pounds, containing marijuana, sticks and stems of marijuana plants, cardboard material, and soil.

The police did not locate all of the evidence they had been seeking in the defendant's home, including a firearm and clothing associated with the kidnapping and assault allegations. Therefore, later that same day, the police applied for a search warrant pertaining to a Cadillac owned by the defendant. Although there had been several additional vehicles on the defendant's property, the police applied for a search warrant only with respect to the Cadillac because the police had observed the defendant walking in the area of that vehicle, and it had been the vehicle that appeared to have been remotely started. The warrant was issued and executed that evening. Inside a bag in the trunk of the Cadillac, the police found a nine millimeter Smith and Wesson handgun, two magazines loaded with ammunition, and a gun holster.

The state initially charged the defendant in two separate informations. In the first information, filed in Docket No. CR-13-0270252-T, the defendant was charged with two counts of kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a), two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2)

(A), two counts of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C), one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), one count of assault in the first degree in violation of § 53a-59 (a) (3), one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and two counts of intimidation of a witness in violation of General Statutes § 53a-151a (a) (2). In the second information, filed in Docket No. CR-13-0270260-S, the defendant was charged with two counts of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), three counts of criminal possession of ammunition in violation of § 53a-217 (a) (1), one count of possession of a controlled substance with intent to sell in violation of § 21a-277 (b), and one count of possession of a controlled substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b) On September 29, 2016, the state filed a motion for joinder of the two informations.[6] At a hearing on October 24, 2016, the defendant stated that he had no objection to the joinder, and the court granted the state's motion.

A jury trial followed, at the conclusion of which the jury acquitted the defendant of the charges set forth in the first information and convicted him of the charges set forth in the second information. The court accepted the verdict but thereafter granted the defendant's motion for a judgment of acquittal as to the count of possession of a controlled substance with intent to sell within 1500 feet of a school. The court imposed a total effective sentence of thirteen years of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court erroneously denied his motion to suppress evidence that was obtained in violation of his right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution[7] and article first, § 7, of the Connecticut constitution.[8] Specifically, he argues that the evidence should have been suppressed because (1) the police conducted an unlawful protective sweep of his home, (2) he was constructively seized by the police, and (3) the search warrant for his vehicle was not supported by probable cause.

The following additional facts and procedural history are relevant to our resolution of these claims. On October 8, 2013, Adam Rembisz, a detective with the New Britain Police Department, and Michael Grossi, a sergeant with the New Britain Police Department (affiants), applied for a search and seizure warrant pertaining to the defendant's residence. The affidavit in support of the application for the search warrant detailed the information that the police had received with respect to the kidnapping and assault allegations.

In addition, it averred, in relevant part, that "a protective sweep of the house was conducted and in plain view a roll of duct tape, handcuffs, (2) laptop computers, and (1) [iPad] was observed inside the living room. In a second floor bedroom officers observed an ax handle, baseball bat, and a cane.[9] [Detective Kevin] Artruc also observed a green leafed substance, which through his past training, [he] believes to be marijuana."[10] (Footnote added.)

As we previously have stated, the affiants applied for a search warrant pertaining to the defendant's vehicle after they executed the search warrant pertaining to the defendant's home. The affidavit submitted in support of the application for the second search warrant averred, in addition to the information that had been contained in the application for the first warrant, that: "[N]o handgun, yellow shirt, steel toe boots were located as described by the victim, however during the incident prior to [the defendant's] being arrested he was observed to walk back and forth to a black Cadillac, bearing registration 137XHF. Responding officers heard the alarm that is commonly sounded when the vehicle is locked or unlocked with a remote as [the defendant] walked to the vehicle. [Department of Motor Vehicle] records show that the said vehicle is registered to the defendant. . . . [The] affiants believe that [the defendant] could have brought evidence to the vehicle from the crime scene within the home prior to surrendering to the police as the handgun, dog collar, yellow shirt, [and] steel toe boots were not located within the residence."

Prior to trial, the defendant filed a motion to suppress "all evidence obtained through warrantless searches of his home and automobile on . . . October 7, 2013," on the grounds that (1) "there were no exigent circumstances or any other reasons" to support the protective sweep, and the evidence would not be admissible under the inevitable discovery doctrine, and (2) "there were no exigent circumstances or any other reasons" to support the "warrantless search" of the defendant's vehicle, and the evidence would not be admissible under the inevitable discovery doctrine.

In his memorandum of law in support of his motion, the defendant argued that with respect to the protective sweep, "there is no evidence . . . that the police had any information whatsoever that there may have been any other people inside [the defendant's] home . . . ." As to the search of the defendant's vehicle, the defendant argued that "[t]here were no 'exigent circumstances' that would have allowed the police to perform the warrantless search of [the defendant's] automobile."

On November 1 and 2, 2016, the court held a hearing on the defendant's motion to suppress. The court heard testimony from the defendant and several members of

the New Britain Police Department. In addition, it admitted into evidence photographs of the defendant's property, a recording of the phone conversation between Sergeant Powers and the defendant, and copies of the search warrants, which included the warrant applications and the affidavits supporting the applications.

At the hearing, the defendant argued that there was no evidence that any other person was inside of the defendant's home to justify the protective sweep. The defendant did not make any additional arguments with respect to the search of the vehicle.

On November 3, 2016, the court issued its memorandum of decision denying the defendant's motion to suppress. The court determined that (1) the protective sweep was lawful and, even if it were not lawful, the evidence would nonetheless be admissible pursuant to the inevitable discovery doctrine, and (2) the search of the defendant's vehicle had been executed pursuant to a search warrant.

The court made the following findings of fact in support of its determination: "On October 7, 2013, at approximately 1:30 p.m., the New Britain police were informed of a serious assault upon two women in a home located at 830 Slater Road. Officer Mark DePinto spoke with [D's son], who relayed that his mother and another woman were tied up, severely beaten and ultimately escaped from 830 Slater Road. [D's son] also relayed that his mother was currently in the hospital, in the intensive care unit. The location of the second female was unknown at this time. [D's son] told DePinto that the home belonged to the defendant . . . and that [the defendant] had indicated he would engage in a shootout with the police if they came to the house.

"The New Britain police patrol division prepared a plan of action: locate [the defendant], any witnesses, the second female injured and present this to the detectives for follow-up investigation. Plainclothes detectives were assigned to surveil 830 Slater Road, and other officers began to gather intelligence about [the defendant]. In reviewing his criminal history, the investigating officers learned [that the defendant] had serious felony convictions and, in light of that information that a weapon was used during the assaults and that [the defendant] possessed weapons in the house, the special response team was also called to the scene. At approximately 2:15 p.m., [Sergeant] Carlos Burgos met with officers in an area near 830 Slater Road to discuss potential scenarios and the safety concerns for the neighbors in the area as well as for the responding officers.

"Photographs of the property confirm the testimony describing the area. There was a brick, two-story dwelling with a steel fence around a portion of the front yard,

and enclosed part of the driveway, extending toward a garage in the rear of the property. A gate across the driveway was locked and from the street, a black car could be seen. There was no contact with [the defendant] up to this time. Simultaneous to the surveillance, other officers were gathering information and relaying it to Burgos and others at the Slater Road address. After 5:30 p.m., the police learned that a former girlfriend of [the defendant] had spoken to him, and the police attempted to reach the defendant over the telephone. The police then used sirens and other loud noises to see if anyone in the house would respond. [The defendant] then exited his house. A home phone number for [the defendant] was obtained, and verbal contact was made first by a dispatch officer and then by [Sergeant] Arthur Powers. Powers negotiated with [the defendant] for over thirty-five minutes to comply with police directives to go to the fence in the front of the house and speak with the police. The recording of the conversation was entered as an exhibit during the hearing. [The defendant] was angry, agitated and uncooperative with both Powers and the police at the house. [The defendant] repeatedly used profane and discriminatory language, often shouting his tirades. He threatened to loosen his dog upon the police officers and taunted the police to shoot him. [The defendant] was distrustful of the police. From the early moments of the recorded conversation, [the defendant] demeaned and blamed the two women victims.

"On-scene officers observed [the defendant] pacing the property, going in and out of the house and, at one point, disrobing, purportedly to show [that] he was unarmed. He was seen holding a knife. One officer saw the rear taillights of the black automobile in the driveway turn on, and when Powers asked him if he turned the car on remotely, [the defendant] denied it. Other officers observed movement inside the house at multiple windows.

"Other officers continued to seek information regarding the incident. DePinto learned from [the defendant's] former girlfriend that she had been to 830 Slater Road over the preceding weekend and had seen the two females, who were still present when she left. She also indicated that [the defendant] was acting irrationally and out of control. A written statement by [D's son] was taken from 5:15 to 5:50 p.m. There, the police learned that [D] had told him that [the defendant] was affiliated with the Outlaw motorcycle gang, he had guns in the house and that he had people watching his house when he wasn't home. They also learned that items of potential evidentiary value could be found within the house.

"At approximately 6:30 p.m., [the defendant] approached the fence to speak with the police, and he was seized by officers and arrested for breach of the

peace, threatening and interfering with the police. [Lieutenant John] Rodriguez made the decision to conduct a protective sweep of the house. He wanted to ensure that there were no victims inside the home, he wanted to ensure that there was no one to endanger officers on the scene, and he wanted to ensure that any evidence would be secure. Within two to three minutes, the sweep was concluded. A search warrant for 830 Slater Road was secured on October 8, 2013, at noon; a search warrant for the Cadillac was secured on the same day at 5:17 p.m."[11]

A

The defendant first argues that the court erred in denying his motion to suppress because the protective sweep was unlawful. Specifically, he argues that the police had "no basis to believe a third party was in the home," and, therefore, they lacked an articulable basis on which to justify the protective sweep. We disagree.

The court, in its memorandum of decision denying the defendant's motion to suppress, determined that the protective sweep was lawful. It found: "Based upon all of the articulable facts and rational inferences known to the New Britain police at the time of the defendant's apprehension, a reasonably prudent officer would conclude the following: a serious assault of two women had occurred within the prior twenty-four to thirty-six hours at 830 Slater Road. One victim was being treated for serious injuries at the hospital. That victim told her son that she was tied up, beaten, hit with a pistol and physically degraded. She said that the defendant had guns in the house and he had people [who] watched his house. After several hours of no contact [between the police and] the defendant while the home was under surveillance, he exited the house. He was uncooperative with the police, and his behavior was erratic, agitated and at times bizarre. The defendant had a history of felony convictions. Movement was seen within the house and a car in the driveway was started, with the defendant denying that he did it. Based upon the defendant's behavior on scene, the police were within their rights to disbelieve the defendant's statements that he possessed no weapons and no [that] one else was inside the house."[12]

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). Accordingly, the trial court's legal conclusion regarding the applicability of the protective sweep doc-

trine is subject to plenary review. See id.; see also *State v. Spencer*, 268 Conn. 575, 585, 848 A.2d 1183 (2004).

"It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met." (Internal quotation marks omitted.) *State* v. *Kendrick*, supra, 314 Conn. 224. "All three exceptions [to the warrant requirement], the exigent circumstances doctrine, the protective sweep doctrine and the emergency doctrine, must be supported by a reasonable belief that immediate action was necessary." Id., 225.

"The protective sweep doctrine . . . is rooted in the investigative and crime control function of the police. . . . As its name suggests, the purpose of the doctrine is to allow police officers to take steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." (Internal quotation marks omitted.) Id., 229. "Recognizing the often competing interests of the individual's expectation of privacy and the officers' safety, the court [in *Maryland* v. *Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)] . . . determined that there were two levels of protective sweeps. Concerning the first tier of protective sweeps, the court concluded that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. . . . Concerning the second tier of protective sweeps, the court concluded: Beyond that . . . we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."[13] (Citation omitted; internal quotation marks omitted). *State* v. *Spencer*, supra, 268 Conn. 588.

"Although the United States Supreme Court never has ruled on the constitutionality of a protective sweep of a home, incident to an arrest occurring just outside that home, the federal courts that have addressed the issue uniformly have held that the reasoning of *Buie* applies to that situation." Id., 589.

In *Spencer*, our Supreme Court recognized "that *Buie* was grounded in the principle that arresting officers have an immediate interest in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. . . . This important safety interest is not diminished simply because the arrest has occurred just outside of the home." (Citation omitted; internal quotation marks omitted.) Id., 590; see also *United States*

v. *Colbert*, 76 F.3d 773, 776 (6th Cir. 1996) ("in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers").[14]

Within the first tier of protective sweeps, arresting officers can "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland* v. *Buie*, supra, 494 U.S. 334. In the present case, the defendant was arrested outside of his home, near the fence line bordering his property. Therefore, the defendant's home cannot be characterized as a space " 'immediately adjoining' " the place of the arrest. See *State* v. *Spencer*, supra, 268 Conn. 591. We therefore must determine whether the search in the present case was justifiable as a second tier protective sweep.

The second tier of protective sweeps under *Buie* encompasses searches of areas beyond those spaces immediately adjoining the place of arrest. To satisfy the fourth amendment, a second tier protective sweep must be supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland* v. *Buie*, supra, 494 U.S. 334.[15] In this case, because the defendant was in custody, the focus of our inquiry is "whether the arresting officers reasonably believed that *someone else* inside the [home] might pose a danger to them. . . . In other words, we examine whether there were specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the apartment at the time of the arrest. . . . Lack of information [concerning the presence of a third party] cannot provide an articulable basis upon which to justify a protective sweep." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Spencer*, supra, 268 Conn. 593–94.

In the present case, the following facts are sufficiently specific and articulable to support a reasonable belief that the defendant's home harbored a third party posing a danger to those on the arrest scene. First, the police reported that they saw movement within the defendant's home.[16] Second, the police reported that there were multiple cars on the defendant's property. Third, it was reported that a car in the driveway was started, and the defendant denied that he was the person who started it. There had been a report of a serious assault of two women that was alleged to have occurred within the prior twenty-four to thirty-six hours at the defendant's home. One of the women was reportedly being treated for serious injuries and alleged that she was hit with a pistol, indicating the presence of a handgun

inside the home that might be used by another individual within the home, thereby posing a danger to police officers and others. In addition, the woman had reported that the defendant had guns in the house and that he had people who watched his house.[17] The defendant's behavior was erratic, agitated, and at times bizarre. On the basis of the defendant's behavior on the scene, the court concluded that the police were within their right to discredit the defendant's statements that he possessed no weapons and that no one else was inside the house.

These facts are sufficiently specific and articulable to support a reasonable belief that a third party was inside of the home and, on the basis of the information that had been provided to the police regarding the presence of firearms at the home, that the third party posed a danger to those on the arrest scene. Accordingly, we conclude, on the basis of the totality of all the facts and the reasonable inferences drawn therefrom, that the warrantless search of the defendant's home was a justifiable protective sweep under *Buie*.

B

The defendant concedes that his next two claims with respect to his motion to suppress are unpreserved and requests review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Generally, this court is not required to consider a claim "unless it was distinctly raised at the trial or arose subsequent to the trial." Practice Book § 60-5. It is well established, however, that an unpreserved claim is reviewable under *Golding* when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 239–40. "The appellate tribunal is free to respond to the defendant's claim by focusing on whichever *Golding* prong is most relevant. . . . [T]he inability to meet any one prong requires a determination that the defendant's claim must fail." (Citation omitted; internal quotation marks omitted.) *State* v. *Esquilin*, 179 Conn. App. 461, 475, 179 A.3d 238 (2018).

1

The defendant claims that the police "laid siege to his home, roused and summoned him with coercive force, and constructively seized him" under the fourth amendment to the United States constitution. He also argues that "[t]his court should adopt a rule against constructive entry" under our state constitution

"regardless of [our analysis under] the fourth amendment." The state maintains, inter alia, that the record is inadequate for review of the defendant's unpreserved claim and, therefore, the claim fails to satisfy the first prong of *Golding*. We agree with the state.

In *United States* v. *Allen*, 813 F.3d 76 (2d Cir. 2016), the United States Court of Appeals for the Second Circuit explained the constructive entry doctrine: "Under [the constructive entry] doctrine, when officers engage in actions to coerce the occupant outside of the home, they '[accomplish] the same thing' and achieve the same effect as an actual entry, and therefore trigger [the] protections [of *Payton* v. *New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)]."[18] *United States* v. *Allen*, supra, 81. The court declined to apply the constructive entry doctrine, but noted that courts applying the doctrine "determine whether a nonexhaustive list of factors, such as the events immediately preceding or accompanying the order, the number and location of officers, the nature and content of the words used to transmit the command, and whether police guns are holstered or brandished, constitute circumstances sufficient to trigger *Payton* . . . ." Id., 88. In reviewing a claim of constructive entry, a court must determine whether "[t]he police show of force and authority was such that a reasonable person would have believed he was not free to leave." (Internal quotation marks omitted.) *United States* v. *Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984), cert. denied, 471 U.S. 1061, 105 S. Ct. 2126, 85 L. Ed. 2d 490 (1985).[19]

In the present case, the court found that "[a]fter 5:30 p.m. . . . the police attempted to reach the defendant over the telephone. The police then used sirens and other loud noises to see if anyone inside the house would respond. [The defendant] then exited his house." The court further found that the defendant was seized by officers at approximately 6:30 p.m., when he was placed under arrest for breach of the peace, threatening, and interfering with the police. As we previously have noted, the defendant did not argue before the trial court that the police constructively entered the defendant's home. The trial court, therefore, did not make any additional factual findings with respect to the conduct of the police when they first attempted to make contact with the defendant and whether the police show of force and authority was such that a reasonable person would have believed he was not free to leave. It is well established, however, that "when reviewing the constitutionality of an alleged seizure, we must parse the entire record, and not only the trial court's express findings." *State* v. *Edmonds*, 323 Conn. 34, 64, 145 A.3d 861 (2016).

"Our Supreme Court has clarified that [a] record is not inadequate for *Golding* purposes because the trial court has not reached a conclusion of law if the record

contains the factual predicates for making such a determination. . . . Nevertheless, [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Morales*, 164 Conn. App. 143, 167, 136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016).

In the present case, the record is insufficient to determine whether a constitutional violation has occurred. First, the record is unclear as to whether the police ordered the defendant to exit his home when they first attempted to make contact with him.[20] At the suppression hearing, the defendant and Sergeant Burgos offered conflicting testimony. The defendant testified that he "heard over the loudspeaker, Robert Cane, come out of your house." Sergeant Burgos, however, testified that, before the defendant first exited the home, one of the officers used audible sirens to make noise seeking to alert anyone within the home. Sergeant Burgos did not testify that a loudspeaker was used.

Second, the record is unclear as to how many police officers surrounded the defendant's home at the time that the constructive entry is alleged to have occurred.[21] Although several officers testified that they had been present at 830 Slater Road, there had been no testimony as to how many total officers were present and whether those officers were in a location such that they would have been visible to the defendant before he exited his home.

In summary, the record is unclear with respect to the factual predicates necessary to establish the defendant's claim on appeal. See *State* v. *Morales*, supra, 164 Conn. App. 167 ("[i]f the facts revealed by the record are . . . unclear . . . as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim" [internal quotation marks omitted]). In addition, the state was not put on notice of this claim and, accordingly, was not given an opportunity to put on evidence regarding this claim.[22] See *State* v. *Chemlen*, 165 Conn. App. 791, 814–15, 140 A.3d 347 (holding record inadequate for review under first prong of *Golding* because state not put on notice of claim made on appeal and, thus, not given opportunity to put on evidence regarding claim, and because record did not contain adequate facts and state prejudiced by lack of notice), cert. denied, 322 Conn. 908, 140 A.3d 977 (2016). Because there is an insufficient record in the present case, there is no way to know whether a violation of constitutional magnitude in fact has occurred. See *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006). The defendant's

claim thus fails under the first prong of *Golding*.[23]

2

The defendant next claims that the police lacked probable cause to search his vehicle. Specifically, he argues that "no officer saw the defendant open [the vehicle]," and "[t]he idea that the defendant could remotely place a pistol in the trunk of the car is not remotely realistic." We conclude that the defendant's claim fails to satisfy the third prong of *Golding*.

"Certain well established legal principles guide our analysis of this issue. Both the fourth amendment to the United States constitution and article first, § 7, of the state constitution require a showing of probable cause prior to the issuance of a search warrant. Probable cause to search exists if . . . (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Although [p]roof of probable cause requires less than proof by a preponderance of the evidence . . . [f]indings of probable cause do not lend themselves to any uniform formula because probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . . Consequently, [i]n determining the existence of probable cause to search, the issuing magistrate assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . In other words, because [t]he probable cause determination is, simply, an analysis of probabilities . . . [p]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub silentio impose a drastically more rigorous definition of probable cause than the security of our citizens' . . . demands. . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. . . .

"Furthermore, because of our constitutional preference for a judicial determination of probable cause, and mindful of the fact that [r]easonable minds may disagree as to whether a particular [set of facts] establishes

probable cause . . . we evaluate the information contained in the affidavit in the light most favorable to upholding the issuing judge's probable cause finding. . . . We therefore review the issuance of a warrant with deference to the reasonable inferences that the issuing judge could have and did draw . . . and we will uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . Finally, [i]n determining whether the warrant was based [on] probable cause, we may consider only the information that was actually before the issuing judge at the time he or she signed the warrant, and the reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State v. Shields*, 308 Conn. 678, 689–91, 69 A.3d 293 (2013), cert. denied, 571 U.S. 1176, 134 S. Ct. 1040, 188 L. Ed. 2d 123 (2014).

We conclude that the information contained in the affidavit supported the issuing judge's determination that probable cause existed to search the defendant's vehicle. The defendant takes issue only with the second prong of the probable cause requirement, namely, "[whether] there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Internal quotation marks omitted.) Id., 689.

As we previously have noted, in the affidavit submitted in support of the application for the second search warrant, the affiants averred: "[N]o handgun, yellow shirt, steel toe boots were located as described by the victim, however, during the incident prior to [the defendant] being arrested he was observed to walk back and forth to a black Cadillac, bearing registration 137XHF. Responding officers heard the alarm that is commonly sounded when the vehicle is locked or unlocked with a remote as [the defendant] walked to the vehicle. DMV records show that the said vehicle is registered to the defendant. . . . [The] affiants believe that [the defendant] could have brought evidence to the vehicle from the crime scene within the home prior to surrendering to the police as the handgun, dog collar, yellow shirt, [and] steel toe boots were not located within the residence."

On appeal, the defendant, citing to the trial transcript, argues: "Critically, no officer saw the defendant open the Cadillac or any of its hatches." As we previously have stated, however, "[i]n determining whether the warrant was based [on] probable cause, we may consider *only the information that was actually before the issuing judge at the time he or she signed the warrant*, and the reasonable inferences to be drawn therefrom." (Emphasis added; internal quotation marks omitted.) *State* v. *Shields*, supra, 308 Conn. 691; see also *State* v. *Holley*, 324 Conn. 344, 353, 152 A.3d 532 (2016) ("[i]n

evaluating whether the warrant was predicated on probable cause, a reviewing court may consider only the information set forth in the four corners of the affidavit that was presented to the issuing judge and the reasonable inferences to be drawn therefrom"). Accordingly, any trial testimony, or lack thereof, with respect to the officers' observations on October 7, 2013, is not to be considered with respect to whether the search of the defendant's vehicle, executed pursuant to a warrant, was supported by probable cause.

In their application for a search warrant, the affiants averred that they observed the defendant walk back and forth to the vehicle in question and that they heard the sound of the vehicle being locked or unlocked as the defendant walked to that vehicle. From this information, the issuing judge reasonably could have inferred that the defendant had access to the vehicle either at the time that they observed his movements or prior to the officers' arrival. The issuing judge, therefore, further reasonably could have inferred that the defendant may have moved the evidence that the police sought from inside his home, where those items were last seen,[24] to the vehicle in question.

We conclude that the information set forth in the affidavit supported the issuing judge's determination that probable cause existed to search the defendant's vehicle and, therefore, the search of the defendant's vehicle that resulted in the seizure of a firearm and ammunition satisfies federal and state constitutional standards. Accordingly, because the defendant has not shown the existence of a constitutional violation that deprived him of a fair trial, his claim fails under the third prong of *Golding*.

## II

The defendant next claims that the trial court abused its discretion when it granted the state's motion to join the two informations for trial. Specifically, he argues that joinder prevented him from testifying. The defendant concedes that he affirmatively waived any objection to the joinder and, therefore, requests that we review his claim under the plain error doctrine. See Practice Book § 60-5. We conclude that the defendant cannot prevail under the plain error doctrine.

The following additional procedural history is relevant to this claim. At the hearing on the state's motion for joinder, the defendant, personally and through counsel, expressly stated that he had no objection to joinder.[25] The court thereafter granted the state's motion.

At trial, after the close of the state's case, the court canvassed the defendant as to whether he would testify on his own behalf. The defendant elected not to testify. During the canvass, the defendant stated that, although he "personally . . . would like to [testify]," when "all the pros and cons were laid out and what we've wit-

nessed so far in the trial," he agreed with defense counsel that it was not in his best interest to testify.[26] The defendant did not thereafter move to sever the informations.[27]

We begin by setting forth the legal principles that guide our analysis of this claim. "An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record. Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application." (Internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017).

"[T]he plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice." (Citation omitted; internal quotation marks omitted.) Id.

An appellant "cannot prevail . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) Id.; see also *State* v. *Coward*, 292 Conn. 296, 307, 972 A.2d 691 (2009). "It is axiomatic that, [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . Put another way, plain error review is reserved for only the most egregious errors. When an error of such a magnitude exists, it necessitates reversal." (Citation omitted; internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 813–14.

The defendant argues that although he affirmatively waived any objection to the joinder, his claim is nevertheless reviewable under the plain error doctrine because of our Supreme Court's holding in *State* v. *McClain*, supra, 324 Conn. 812. In *McClain*, our Supreme Court held that a *Kitchens* waiver[28] does not preclude plain error review. Id.; see also *State* v. *Juan V.*, 191 Conn. App. 553, 571–75,      A.3d      (2019)

(reviewing claim for plain error that defendant had waived pursuant to *Kitchens*).

In response, the state argues that "[t]he defendant's reliance on *McClain* is misplaced because in *McClain*, our Supreme Court concluded that a " '*Kitchens* waiver,' " which refers to an implied waiver based on counsel's having had an opportunity to review proposed jury instructions, does not preclude plain error review . . . . Here, however, counsel and the defendant explicitly stated that they had no objection to joinder. As in [*State* v. *Cancel*, 149 Conn. App. 86, 102, 87 A.3d 618, cert. denied, 311 Conn. 954, 97 A.3d 985 (2014)], these statements constitute an explicit waiver of any claim challenging joinder and plain error review is not appropriate." (Citation omitted.) In *Cancel*, this court rejected a claim that it was plain error for the trial court to grant the state's motion for joinder, reasoning that the defendant had waived any claim regarding the joinder. This court concluded: "Because . . . the defendant waived any claim regarding the joinder of the cases for trial, there is no error to correct. . . . [A] valid waiver . . . thwarts plain error review of a claim." (Citation omitted; internal quotation marks omitted.) Id., 102–103.

Even if we were to read our Supreme Court's holding in *McClain* broadly to extend its application to the circumstances of the present case, and thus assume that the defendant's waiver would not preclude him from prevailing under the plain error doctrine, we conclude that the defendant cannot demonstrate that the claimed error was "so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis omitted; internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 812.

On appeal, the defendant argues that joinder prevented him from testifying.[29] Specifically, he argues that he had testimony to provide concerning the firearms charges in the second information but that he had "ample reason not to testify with respect to the assault and kidnapping counts" in the first information and, therefore, joinder "caused substantial prejudice . . . ." We are not persuaded.

The defendant relies on *State* v. *Perez*, 322 Conn. 118, 139 A.3d 654 (2016), in support of his argument. In *Perez*, our Supreme Court addressed the standard that applies "when a criminal defendant contends that severance of the charges is necessary because he or she wishes to testify as to some charges but not as to others."[30] It held that "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and [a] strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count

and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." (Internal quotation marks omitted.) Id., 135–36.

In the present case, however, the defendant did not move to sever the informations. He did not, at any point, indicate that he wanted to testify concerning some of the counts against him but not others, even when the court canvassed him regarding his decision not to testify. The claimed error, therefore, was not "so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis omitted; internal quotation marks omitted.) *State* v. *McClain*, supra, 324 Conn. 812.[31] Accordingly, joinder did not constitute plain error.

### III

Last, the defendant raises an unpreserved claim of judicial bias. Specifically, he argues: "In this case, the trial court adjudicated the accusers 'victims' in its November 3, 2016 memorandum of decision on suppression—four days before evidence commenced and two weeks before the defendant was acquitted of the allegations in which the trial court named the accusers 'victims.' This combined with the trial court's sentencing comments, in which it excoriated the defendant for acts far beyond the scope of his convictions including acquitted conduct, constitute[d] actual and apparent bias at sentencing." (Emphasis omitted.) We are not persuaded.

The following additional procedural history is relevant to this claim. In its memorandum of decision on the defendant's motion to suppress evidence, the court referred to D and P as "victims." Specifically, in its memorandum of decision, the court found that "[f]rom the early moments of the recorded conversation, [the defendant] demeaned and blamed the two women victims." In addition, in its determination with respect to the protective sweep, the court found, in relevant part, that "[b]ased upon all of the articulable facts and rational inferences known to the New Britain police at the time of the defendant's apprehension, a reasonably prudent officer would conclude the following: a serious assault of two women had occurred within the prior twenty-four to thirty-six hours at 830 Slater Road. One victim was being treated for serious injuries at the hospital. That victim told her son that she was tied up, beaten, hit with a pistol and physically degraded."

The defendant did not, at any point in time, move for judicial disqualification or for a mistrial before the trial court. At the conclusion of the trial, the defendant was acquitted of the kidnapping and assault charges in

which D and P were alleged to have been victims.

At the defendant's sentencing, the court summarized the events leading up to the discovery of the firearms, ammunition, and marijuana. It noted in relevant part: "The defendant's interactions with the New Britain police on the date in question showed a highly agitated man, unwilling to interact with the police in any way but the way he wanted. The original allegations of kidnapping, assault and weapons were such a serious nature to the police, that's all they had, and they were trying to investigate it, but at the time that you interacted with them, Mr. Cane, you escalated the situation, and it became extremely volatile and all of this was because of your actions. You were manipulative with the police on that day and you were invasive in your communications. I believe that you were still high, likely on the Oxycodone, given your addiction to those prescription medications."[32] The court also noted that the defendant's mental health evaluations indicated that he "can be extremely manipulative and . . . highly critical of authority . . . ." Last, the court stated that "[t]his entire case stems from [the defendant's] poor choices. His choice to escalate his prescription medication addiction instead of seeking help, his choice to grow marijuana and keep it in his house, his choice to keep a nine millimeter handgun and enough ammunition for who knows what, his choice to go out and invite two unknown women into his home and engage in a drug-fueled week of debauchery. . . . You have no one to blame but yourself for the position that you find yourself in today."

Immediately before imposing the defendant's sentence, the court stated: "The sentence today is simply punishment. You are a grown man who has had numerous contacts with the criminal justice system. Yes, you finished probation, but you clearly learned nothing from your experience and when you get into trouble, you do it big. You are violent, you are dangerous and you cannot make good decisions or learn from your actions. Society needs to be protected from you, and this sentence will hopefully make sure that you do not have a next big crime."

On appeal, the defendant claims that the court's reference to D and P as victims in its memorandum of decision on his motion to suppress, in addition to its statements at the sentencing hearing, demonstrate judicial bias. The defendant concedes that he failed to preserve this claim and now requests review pursuant to the plain error doctrine; Practice Book § 60-5; or under *State* v. *Golding*, supra, 213 Conn. 239–40.[33]

"Accusations of judicial bias or misconduct implicate the basic concepts of a fair trial. . . . It is a well settled general rule [however] that courts will not review a claim of judicial bias on appeal unless that claim was properly presented to the trial court via a motion for

disqualification or a motion for mistrial. . . . Nevertheless, our Supreme Court has recognized that a claim of judicial bias strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary. . . . No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If [the judge] departs from this standard, he [or she] casts serious reflection upon the system of which [the judge] is a part. . . .

"In reviewing a claim of judicial bias, this court employs a plain error standard of review. . . . The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification." (Citations omitted; internal quotation marks omitted.) *State* v. *Carlos C.*, 165 Conn. App. 195, 206–207, 138 A.3d 1090, cert. denied, 322 Conn. 906, 140 A.3d 977 (2016).

In the present case, the defendant argues that the court displayed judicial bias[34] because it first "found the defendant guilty [of the kidnapping and assault charges] prior to any evidence" by referring to D and P as victims in its memorandum of decision,[35] and subsequently considered the kidnapping and assault charges in sentencing the defendant. (Emphasis omitted.) The defendant argues that, because he was acquitted of the kidnapping and assault charges, the court was required to find that the acquitted conduct had been proven by a preponderance of the evidence, pursuant to *United States* v. *Watts*, 519 U.S. 148, 156, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997),[36] in order to be considered at the defendant's sentencing. Specifically, he contends that "the *Watts* court considered whether a sentencing court could consider acquitted conduct when sentencing for counts of [a] conviction (in a multicount indictment). . . . [T]he court held that a district court could consider the acquitted conduct at sentencing if it found it proven by a preponderance of the evidence." (Citation omitted; emphasis omitted.) The defendant further argues that the court in the present case "was unable to impartially adjudicate this sentencing fact" because it previously had referred to D and P as victims in its memorandum of decision on his motion to suppress.[37]

The record, however, does not support the defendant's contention that the court considered the kidnapping and assault charges when it sentenced the defendant. Although the court had mentioned the kidnapping and assault charges when it summarized the events leading to the discovery of the firearms, ammunition, and marijuana, it had referred to the kidnapping and assault charges as the "original allegations" and there-

after focused on the events that occurred on October 7, 2013. In addition, although the court referred to the defendant as "violent," it had done so in the context of reviewing the defendant's criminal history. As we previously have stated, the defendant had prior convictions of violent felony offenses, which were noted in the defendant's presentence investigation report. We are not persuaded that the court's comment referred to the kidnapping and assault charges. The record, therefore, does not provide a basis for the defendant's claim of judicial bias. Accordingly, because we conclude that the trial court did not display judicial bias, there is no manifest injustice that warrants reversal of the judgment pursuant to the plain error doctrine.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury also found the defendant guilty of one count of possession of a controlled substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b). Prior to sentencing, however, the trial court granted the defendant's postverdict motion for a judgment of acquittal as to that count. The jury acquitted the defendant of two counts of kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a), two counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), two counts of kidnapping in the first degree in violation of § 53a-92 (a) (2) (C), one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), one count of assault in the first degree in violation of § 53a-59 (a) (3), one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and two counts of intimidation of a witness in violation of General Statutes § 53a-151a (a) (2).

[2] The neighbors had given the detectives permission to conduct their surveillance from the porch.

[3] The police had been attempting to contact Barbara Micucci, the defendant's former girlfriend. At approximately 5 p.m., when Micucci learned that the police wanted to speak to her, she called the defendant and said something to the effect of "what the 'f' is the New Britain police looking for me for or wanting to talk to me . . . ." The defendant told her that he had no idea and that he had been sleeping all day. Micucci then contacted the New Britain Police Department and provided the defendant's phone number.

[4] At trial, no evidence had been presented with respect to what time Sergeant Powers first spoke with the defendant. On appeal, the parties do not dispute that the defendant's phone conversation with Sergeant Powers occurred after the defendant first exited his home. See part I B 1 of this opinion.

[5] The defendant was arrested on charges unrelated to this appeal. Specifically, he was arrested on charges of breach of the peace, threatening, and interfering with the police that were based on his actions toward the police during this encounter. See part I of this opinion. The state entered a nolle prosequi as to each of those charges.

[6] The state filed the motion for joinder on the ground that the evidence in the two cases was cross admissible.

[7] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

[8] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[9] These items had been evidence relevant to the kidnapping and assault allegations.

[10] Artruc, a detective with the New Britain Police Department, acknowledged that the affidavit in support of the search warrant application men-

tioned him observing marijuana during the protective sweep. Detective Artruc testified, at both the suppression hearing and at trial, that he had no recollection of being involved in the protective sweep. At trial, he explained: "It is entirely possible that I was there on the [seventh of October], but I don't have a personal recollection of my involvement on the seventh."

[11] The defendant does not challenge any of these factual findings.

[12] The court went on to conclude that even if the protective sweep were not lawful, the evidence was nonetheless admissible pursuant to the inevitable discovery doctrine. It stated: "The credible evidence established that the search warrant for the home had . . . begun at approximately 5:50 p.m. by [Detective Raymond Grzegorzek], once [the complainant's] statement was completed. At that point, the police had a reasonable belief that a crime had been committed and [that] evidence of it could be found within the premises. . . . [T]he information supporting probable cause had been the result of the information gathered in the hours prior to the defendant's arrest on the misdemeanor charges." (Citations omitted.)

[13] In *State* v. *Kendrick*, supra, 314 Conn. 212, our Supreme Court noted that a protective sweep need not be conducted incident to an arrest: "Although originally a protective sweep was defined as one made incident to a lawful arrest . . . the scope has since been broadened so that the current rule is that a law enforcement *officer present in a home under lawful process* . . . may conduct a protective sweep when the officer possesses articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." (Citation omitted; emphasis altered; internal quotation marks omitted.) Id., 229–30. Because the protective sweep in the present case was conducted incident to an arrest, our analysis continues to be informed by the second tier of protective sweeps as set forth in *Spencer* and *Buie*.

[14] In *State* v. *Spencer*, supra, 268 Conn. 590, our Supreme Court cited to *United States* v. *Henry*, 48 F.3d 1282 (D.C. Cir. 1995), in which the United States Court of Appeals for the District of Columbia Circuit explained: "Although *Buie* concerned an arrest made in the home, the principles enunciated by the [United States] Supreme Court are fully applicable where, as here, the arrest takes place just outside the residence. . . . That the police arrested the defendant outside rather than inside his dwelling is relevant to the question of whether they could reasonably fear an attack by someone within it. The officers' exact location, however, does not change the nature of the appropriate inquiry: Did articulable facts exist that would lead a reasonably prudent officer to believe a sweep was required to protect the safety of those on the arrest scene?" (Citations omitted.) Id., 1284.

[15] The defendant argues that for a protective sweep of a home incident to an arrest that has occurred just outside of that home, we should apply the test used by the United States Court of Appeals for the Second Circuit in *United States* v. *Oguns*, 921 F.2d 442, 446 (2d Cir. 1990), because that test was more recently applied by a court in the District of Connecticut, in *United States* v. *Butler*, Docket No. 3:16 CR 123 (AWT), 2017 WL 4150466, *4 (D. Conn. September 19, 2017).

Under *Oguns*, a protective sweep inside of a home incident to an arrest outside of that home is permissible "if the arresting officers had (1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." (Internal quotation marks omitted.) *United States* v. *Oguns*, supra, 921 F.2d 446. The defendant does not apply this test to the facts of the present case or explain how applying this test would warrant a different result. See id. ("[a]lthough we articulated this standard before *Buie*, we think it may be read consistently with the Supreme Court's recent holding concerning security sweeps").

In *Spencer*, our Supreme Court referenced the decision in *Oguns*. See *State* v. *Spencer*, supra, 268 Conn. 589, 597. It nonetheless applied the test set forth by the United States Supreme Court in *Buie* to a protective sweep of a home incident to an arrest occurring just outside that home. Accordingly, abiding by our Supreme Court's precedent in *Spencer*, we apply the test set forth in *Buie*.

[16] Specifically, at the suppression hearing, Sergeant Burgos testified that the police "were getting information [that] there was movement at the front of the house and at the rear of the house at the same time." Sergeant Burgos explained that it was dark outside at that time and the lights were on inside the defendant's home, and he could therefore see silhouettes and movement

through the windows.

[17] The police also had information that the defendant was involved in a motorcycle gang.

[18] In *Payton* v. *New York*, supra, 445 U.S. 576, the United States Supreme Court held that the fourth amendment to the United States constitution "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."

[19] The defendant relies on *Morgan* in support of his argument of constructive entry. In *Morgan*, "[n]ine police officers and several patrol cars approached and surrounded the Morgan residence in the dark. The officer in charge strategically positioned his car in the driveway in front of the Morgan home blocking any movement of [the defendant's] car. The police then called for [the defendant] to come out of the house." *United States* v. *Morgan*, supra, 743 F.2d 1164. The court also noted that the police "flooded the house with spotlights and summoned [the defendant] from his mother's home with the blaring call of a bullhorn." Id., 1161. The United States Court of Appeals for the Sixth Circuit determined that "[t]hese circumstances surely amount to a show of official authority such that a reasonable person would have believed he was not free to leave." (Internal quotation marks omitted.) Id., 1164. It therefore concluded that "the record provides ample proof that, as a practical matter, [the defendant] was under arrest . . . as soon as the police surrounded the Morgan home, and therefore, the arrest violated *Payton* because no warrant had been secured." (Citation omitted; internal quotation marks omitted.) Id.

[20] The essence of the defendant's constructive entry claim is that the coercive conduct of the police forced him to exit his home. As we previously have stated, the defendant exited then reentered his home several times. At oral argument before this court, the defendant clarified that his claim is that the police constructively seized him when he *first* exited his home, after the police surrounded his home and used their sirens to get his attention. The record shows that the police placed only one phone call, which the defendant did not answer, before he first exited his home. Therefore, the defendant's argument that the multiple phone calls by the police, including his phone conversation with Sergeant Powers, which occurred *after* the defendant first exited his home, are irrelevant to our analysis of his claim. See footnote 4 of this opinion.

The defendant also argues that this was a "quintessential seizure" because the police blocked off the street in front of the defendant's home. We are not persuaded. Although there had been testimony that the police blocked off the defendant's street, there was no evidence presented that it had been blocked off *in front of the defendant's home.* There is no evidence in the record that the defendant saw, or could have seen, that the police blocked off the street. Therefore, we cannot conclude that this police conduct constituted a "show of force and authority . . . such that a reasonable person would have believed he was not free to leave." (Internal quotation marks omitted.) *United States* v. *Morgan*, supra, 743 F.2d 1164; see also *State* v. *Edmonds*, supra, 323 Conn. 52.

[21] The defendant argues that "[t]he record clearly establishes that no fewer than seven armed officers surrounded the defendant's home . . . ." This argument, however, is not supported by the record. In addition, although Sergeant Burgos testified that there were at least three officers directly in front of the defendant's home, and that the officers were displaying their firearms, Sergeant Burgos did not explain *when* these three officers were in front of the defendant's home.

[22] For example, as the state points out in its brief, if it had been put on notice of the defendant's claim, it could have adduced evidence from which the court could conclude that the defendant exited his home voluntarily and not as a result of police coercion.

[23] The defendant further requests that we review his claim as plain error under Practice Book § 60-5. We previously have held that "[b]ecause the record is inadequate for review under *Golding*, it is also inadequate for consideration under the plain error doctrine." (Internal quotation marks omitted.) *State* v. *Leon*, 159 Conn. App. 526, 536 n.9, 123 A.3d 136, cert. denied, 319 Conn. 949, 125 A.3d 529 (2015). The defendant's claim also fails, therefore, under the plain error doctrine.

[24] The affiants averred that a handgun, yellow shirt, and steel toe boots had been items of interest with respect to the kidnapping and assault allegations, and that they had not been located inside the defendant's home. The affidavit contained information that D had been wearing a "construction yellow colored t-shirt" during the alleged assault that occurred inside the

defendant's home, during which the defendant had reportedly "pistol-whipped" D and P and kicked D in the stomach with steel toe boots.

[25] At the hearing on the state's motion for joinder, the following colloquy took place between the court and defense counsel:

"The Court: . . . You had no objection to the motion for joinder, is that correct, [defense counsel]?

"[Defense Counsel]: Yes, Your Honor. . . .

"The Court: All right. So, this is something, I take it, you've discussed with your client before today, is that right, [defense counsel]?

"[Defense Counsel]: Yes, Your Honor.

"The Court: Okay. And your client has no objection to the joining of these two informations?

"[Defense Counsel]: No, Your Honor."

The court then addressed the defendant directly, and the following colloquy occurred:

"The Court: All right. Is that correct, sir, Mr. Cane, you have no objection?

"[The Defendant]: Yes, Your Honor."

[26] The court thought that the defendant was "hedging a little bit" and reiterated that it was the defendant's decision whether to testify. The defendant responded that he thought it was his decision "not to testify" on the basis of "the advice of everyone concerned and what we've seen so far presented by the prosecution." When asked whether this decision was based on his own free will, the defendant stated: "Yeah, after consultation with my attorney and family, yes." The defendant thereafter asked the court whether he would "get a chance to say something" after "the prosecution has their closing arguments . . . ." The court explained that he could only do so if he were to testify. The defendant explained that he understood and stated that his attorney's cross-examination had made it "pretty clear" as to why the jury should not believe the testimony presented. The court again asked the defendant whether he understood that he was "giving up [his] opportunity to testify before the jury," and the defendant responded that he did.

[27] Pursuant to Practice Book § 41-18, "[i]f it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon its own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

[28] In *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), our Supreme Court "established a framework under which we review claims of waiver of instructional error . . . . [T]he court emphasized that waiver involves the idea of assent . . . and explained that implied waiver occurs when a defendant had sufficient notice of, and accepted, the instruction proposed or given by the trial court. . . . More specifically, the court held that when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Ramon A. G.*, 190 Conn. App. 483, 500–501, 211 A.3d 82 (2019).

[29] The defendant also argues that "joinder burdened [his] ability to plea bargain." The defendant cites to *Lafler* v. *Cooper*, 566 U.S. 156, 170, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012), for the proposition that "the reality [is] that criminal justice today is for the most part a system of pleas, not a system of trials." In *Lafler*, however, the United States Supreme Court held that a defendant is entitled to effective assistance of counsel during plea negotiations. Id., 162. The issue in that case did not involve a defendant's right to plea bargain in the first instance, nor did it involve the effect of joinder on the plea bargaining process. The defendant cites no legal authority to support his proposition that joinder is improper if it impedes a defendant's "ability to plea bargain." We are, therefore, not persuaded by this argument.

[30] Our Supreme Court explained that "joinder of unrelated criminal charges can cause unfair prejudice when it embarrasses or confounds an accused in making his defense. . . . For example, [p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence." (Citation omitted internal quotation marks omitted.) *State* v. *Perez*, supra, 322 Conn. 134. It further explained: "[B]ecause of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma:

whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other." (Internal quotation marks omitted.) Id., 134–35.

[31] In addition, the defendant cannot demonstrate that joinder resulted in "manifest injustice" necessitating reversal of the judgment pursuant to the plain error doctrine. In the present case, the defendant argues that he "could have testified to everything his counsel argued at closing." Specifically, he argues that he could have testified that "(1) he inherited the home from his father; (2) it was cluttered; (3) the guns were his father's; D and P were stealing from him; (4) D drove his Cadillac on October 4; (5) she found the gun in the house and was shopping it around pawn shops; [and] (6) he had no idea the old [World War II] rifle was in the closet." In response, the state argues, inter alia, that "[i]t is unclear how this evidence would have been more compelling if presented through his testimony [rather] than through the testimony of other witnesses." We agree with the state.

Although the defendant elected not to testify, evidence had been presented at trial concerning each of these points. In addition, as the defendant himself points out, defense counsel's closing argument was based, in part, on this evidence. Accordingly, there is no manifest injustice that warrants reversal of the judgment pursuant to the plain error doctrine.

[32] The defendant's substance abuse was noted throughout his presentence investigation report.

[33] Because the record is adequate for review and the defendant's claim is of constitutional magnitude, we agree that the defendant is entitled to review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. For the reasons we will discuss in this opinion, however, we conclude that the alleged constitutional violation does not exist and that the record does not establish that the trial court's actions deprived him of a fair trial. See *State* v. *Saturno*, 322 Conn. 80, 102 n.20, 139 A.3d 629 (2016). Accordingly, we conclude that the defendant's claim fails to satisfy the third prong of *Golding*.

To the extent that the defendant's claim is based on the appearance of bias, in addition to actual bias, the claim is not reviewable under *Golding* because it is not constitutional in nature. See *State* v. *James R.*, 138 Conn. App. 181, 203, 50 A.3d 936 ("[I]nsofar as the claim is based on various statements made by the court during the course of the trial, the claim essentially is that the court *appeared to be partial*. We conclude that these aspects of the claim are not reviewable under *Golding* because they are not constitutional in nature." [Emphasis in original.]), cert. denied, 307 Conn. 940, 56 A.3d 949 (2012); see also *State* v. *Herbert*, 99 Conn. App. 63, 68 n.7, 913 A.2d 443 ("[t]he defendant's claim of judicial bias based solely upon the *appearance* of partiality, does not rise to the level of a constitutional violation" [emphasis in original; internal quotation marks omitted]), cert. denied, 281 Conn. 917, 917 A.2d 999 (2007).

[34] The defendant claims that the court displayed both actual bias and apparent bias, which he argues rises to the level of "presumptive" bias. In support of his claim of presumptive bias, the defendant cites to several cases from the United States Court of Appeals for the Fifth Circuit. These cases provide that "presumptive bias [is] the one type of judicial bias other than actual bias that requires recusal under the Due Process Clause. . . . Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that the probability of actual bias . . . is too high to be constitutionally tolerable. . . . [A] judge's failure to recuse constitutes presumptive bias in three situations: (1) when the judge has a direct personal, substantial, and pecuniary interest in the outcome of the case, (2) when [she] has been the target of personal abuse or criticism from the party before [her], and (3) when [she] has the dual role of investigating and adjudicating disputes and complaints." (Citations omitted; internal quotation marks omitted.) *Richardson* v. *Quarterman*, 537 F.3d 466, 475 (5th Cir. 2008), cert. denied, 555 U.S. 1173, 129 S. Ct. 1355, 173 L. Ed. 2d 589 (2009); see also *Buntion* v. *Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008), cert. denied, 555 U.S. 1176, 129 S. Ct. 1306, 173 L. Ed. 2d 593 (2009); *Bigby* v. *Dretke*, 402 F.3d 551, 558 (5th Cir.), cert. denied, 546 U.S. 900, 126 S. Ct. 239, 163 L. Ed. 2d 221 (2005). Like the defendant's claim of actual bias, his claim of presumptive bias is predicated on the court's use of the kidnapping and assault charges at his sentencing. Accordingly, for the reasons set forth in this opinion, we reject the defendant's claim of presumptive bias.

[35] We first note that the trial court's use of the term "victims" in its memorandum of decision on the defendant's motion to suppress was not indicative of bias. In *State* v. *Cortes*, 276 Conn. 241, 249 n.4, 885 A.2d 153

(2005), the case cited by the defendant in support of his argument, the state conceded that the trial court's seventy-six references to the complainant as the "victim" in its jury charge were improper. Our Supreme Court held that "references to the complainant as the 'victim' [are] inappropriate where the very commission of a crime is at issue" because "the jury could have drawn only one inference from its repeated use, namely, that the defendant had committed a crime against the complainant." Id. In the present case, the court did not refer to D and P as victims in front of the jury. The reasoning of the court in *Cortes*, therefore, is inapposite.

Moreover, we note that the defendant does not cite any legal authority to support his proposition that a court's use of the term "victim," where the defendant is subsequently tried by a jury, and not by the court, constitutes an adjudication of a defendant's guilt.

[36] In *Watts*, the United States Supreme Court considered two cases in which two panels of the United States Court of Appeals for the Ninth Circuit held that sentencing courts could not consider the conduct underlying any charges for which the defendants had been acquitted. *United States* v. *Watts*, supra, 519 U.S. 149.

In the first case, the jury convicted the defendant of possessing cocaine base with intent to distribute, but acquitted him of using a firearm in relation to a drug offense. Id., 149–50. Despite the defendant's acquittal on the firearms count, the sentencing court found by a preponderance of the evidence that the defendant had possessed the guns in connection with the drug offense. Id., 150. In calculating the defendant's sentence, the sentencing court therefore added two points to his base offense level under the federal sentencing guidelines. Id. In the second case, the defendant was charged with two counts of aiding and abetting possession with intent to distribute cocaine on the basis of two separate drug transactions. The jury convicted the defendant on the first count but acquitted her on the second count. Id. The sentencing court found by a preponderance of the evidence that the defendant had indeed been involved in the second transaction. Id., 150–51. The sentencing court determined that the second sale was relevant conduct under the federal sentencing guidelines and therefore calculated the defendant's base offense level under the guidelines by aggregating the amounts of both sales. Id., 151. The United States Court of Appeals for the Ninth Circuit vacated the sentence in each case and held that a sentencing judge may not, under any standard of proof, rely on conduct of which the defendant was acquitted. Id., 150–51.

The United States Supreme Court held that, pursuant to 18 U.S.C. § 3661 and the federal sentencing guidelines, federal judges may consider conduct underlying any charges for which the defendant was acquitted, so long as that conduct has been proven by a preponderance of the evidence. Id., 157. The court explained: "[A]n acquittal is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences . . . . Thus . . . the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty." (Citations omitted; internal quotation marks omitted.) Id., 155.

[37] The defendant also argues that the court exhibited bias at sentencing by (1) "fault[ing] the defendant for his anger at the police and demeaning the accusers," (2) "explicitly disregard[ing] mitigating evidence with respect to the old Japanese rifle"; see footnote 31 of this opinion; (3) "punish[ing] the defendant for telling the police to leave his property," (4) "claim[ing] the defendant '[chose] to escalate his . . . addiction' in spite of the fact that addiction is a disease," and (5) finding the defendant "to be violent in the absence of violent crime convictions." We are not persuaded.

First, there is nothing in the record to support the defendant's argument that the court punished the defendant for telling the police to leave his property. Next, the defendant's substance abuse, as well as his prior convictions of violent felony offenses, were noted in the defendant's presentence investigation report. The defendant's demeanor, namely, his "anger at the police and demeaning the accusers," as well as his presentence investigation report, are legitimate sentencing considerations. See *State* v. *Elson*, 311 Conn. 726, 782, 91 A.3d 862 (2014) ("[t]he defendant's demeanor, criminal history, [and] presentence investigation report . . . remain legitimate sentencing considerations" [internal quotation marks omitted]).

Last, with respect to the defendant's argument regarding the rifle, there was evidence presented at trial that the defendant's home, where the rifle was found, had once belonged to his father, who died in 2007. There was

evidence presented that the rifle was a World War II surplus rifle and that the defendant's father was a veteran of World War II. Nevertheless, the jury found the defendant guilty of criminal possession of a firearm with respect to the rifle. The court was not, therefore, "explicitly disregard[ing] mitigating evidence with respect to the old Japanese rifle," but rather, sentencing the defendant in accordance with the jury's verdict.

---